Argued December 21, 1928, reversed and remanded January 15, 1929.

STATE *v.* ROBERT GREEN.

(273 Pac. 381.)

For appellant there was a brief over the name of *Mr. Hugh Barclay*, with oral arguments by *Mr. Arthur K. Peck* and *Mr. Dal M. King*.

For respondent there was a brief and oral argument by *Mr. J. B. Bedingfield*, District Attorney.

BELT, J.—The defendant was convicted of the crime of murder in the first degree and was sentenced to suffer the death penalty.

1, 2. The pivotal question in the case is whether the trial court erred in the admission of defendant's written confession. The offer in evidence of this confession presented a preliminary question of mixed law and fact for the court to decide. It was called upon to determine whether the State had established *prima facie* that the confession was freely and voluntarily made and was not the result of the influence

of fear, hope or promise of benefit held out to accused by a third person. This preliminary question was addressed to the court and its decision will not be disturbed on appeal unless the record discloses clear and manifest error: *State* v. *Rathie et al.*, 101 Or. 339 (199 Pac. 169, 200 Pac. 790); *State* v. *Stevenson*, 98 Or. 285 (193 Pac. 1030); *State* v. *Morris*, 83 Or. 429 (163 Pac. 567). The procedure to be followed by trial courts when confessions are offered in evidence was clearly and accurately stated by Mr. Justice HARRIS in a concurring opinion in *State* v. *Morris, supra,* and approved by this court without dissent in *State* v. *Stevenson, supra.* It need not be restated.

3–5. In determining whether the lower court erred we do not review its findings upon conflicting evidence relative to whether or not the confession was voluntary. The inquiry is: Did the court, from the undisputed testimony offered by the State, properly conclude that the confession was freely and voluntarily made? Was the court wrong, as a matter of law, in its conclusions from undisputed evidence? This presents a legal question for review. It is tantamount to a demurrer to the evidence. Of course, if the confession was properly admitted, it was for the jury ultimately to determine its weight and effect. It is to be borne in mind that the State must affirmatively show that the confession was made under conditions not calculated to produce a false statement. As Justice McBRIDE said in *State* v. *Howard,* 102 Or. 431 (203 Pac. 311): " * * acknowledgment of guilt is *prima facie* involuntary and imposes upon the state the burden of showing that it was not induced by threats or promises of favor."

Having made these general observations as to the law applicable to confessions, we turn to the facts and circumstances surrounding the making of the confession.

Caleb Green, a crippled and feeble man of about 65 years of age, is alleged to have been beaten to death with some blunt instrument at or near his cabin in Coos County, Oregon, during the early morning hours of November 21, 1927. On the evening of the same day, after a search and investigation of the premises, the body of the deceased was found, covered with ferns, about fifty feet from his cabin. The defendant, Robert Green, was suspected of the crime and was arrested on the following day. In custody of the deputy sheriffs he was taken to the city hall at Marshfield, Oregon, where the district attorney, after warning the defendant that any statement made by him might be used against him, inquired at much length of defendant as to his knowledge of the crime. This examination was had before the official court reporter and continued for several hours, as evidenced by the 104 typewritten pages of questions and answers. Before this self-constituted inquisitorial body the defendant was subjected to many searching questions by the deputy sheriffs and the district attorney. A Dr. Russell Keizer appeared and "testified" concerning certain blood stains on the garments of the defendant. He also examined the accused relative to scratches and bruises found on his body. No objections were interposed to any of the questions asked, as defendant was not represented by counsel. At this examination defendant strongly maintained his innocence, although his inquisitors, after much persistence, succeeded in obtaining a few minor damaging admis-

sions against him. It might also be added that defendant was taken to the morgue where he was given the privilege of viewing the corpse of the man he was accused of having killed. After looking on the body, he was asked by the district attorney, "Well, how do you feel? Any different now?" and responded, "I don't feel a bit different now than I did before." At the conclusion of the examination, the defendant was taken to the county jail at Coquille.

About one week elapsed before he succeeded in obtaining the advice and benefit of counsel although, during his examination on November 22d, he requested an attorney. The district attorney replied: "We will give you an opportunity at the proper time."

The statute thus provides the procedure to be followed in case of arrest:

Section 1746. "If the crime charged in the warrant be a felony, the officer making the arrest must take the defendant before the magistrate who issued the warrant, or some other magistrate in the same county, as provided in Section 1740."

Section 1752. "The defendant must, in all cases, be taken before the magistrate without delay."

Section 1772. "When the defendant is brought before a magistrate upon an arrest, * * the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel, before any further proceedings are had."

It may well be said that the mere fact that the arresting officer ignored these provisions of the statute would not render the confession inadmissible, but we have deemed it proper to consider it as a sort of background for the picture.

On December 5, 1927—there being present, J. B. Bedingfield, district attorney; Frank Osmund, deputy sheriff; George Bohrer, deputy sheriff; W. P. Anderson, deputy sheriff; and Geo. F. Begg, court reporter—a further examination of the defendant was had to ascertain what knowledge, if any, he had concerning the commission of the alleged crime. Defendant did not appear by counsel. The district attorney again admonished the defendant that any statements he made must be voluntary and that anything that he said might be used against him. This examination commenced at 9 o'clock in the evening and continued throughout the night until 6:30 in the morning. Witness the following as illustrative of the inquiries propounded to defendant to ascertain the truth:

"Q. You believe in fingerprints, don't you? You seen me what I did to you the other day. If I would prove to you that your fingerprints was on that baseball bat, would you believe it, after it was found down there by his body? A. I know my fingerprints ain't there.

"Q. Well, what would you say if I proved they was there?

"Q. (Deputy Sheriff.) He says there was no blood on his hat either.

"Q. (Deputy Sheriff.) Now listen; how would you explain it if I proved to you that your fingerprints were on that bat? A. My fingerprints wasn't on it.

"Q. Well listen, if I proved they was on it, what would you say? A. You can't prove it.

"Q. Now I am asking you if I proved that they was on there, that your fingerprints was on that bat and that bat was laying seven feet from that murdered man's body, what would you say if I proved it? What would you say? I want you to

answer that question, what could you say? A. I know my fingerprints—

"Q. (Interrupting.) That is not what I am asking you. I want to know what would you say if I proved they were on there and a photograph taken of the fingerprints on it, what would you say? Now I want you to answer that question.

"Q. (Deputy Sheriff.) Would the neighbors still be all damned liars? A. I know I never had that bat.

"Q. (Deputy Sheriff.) Don't try to evade the question. What would you say if I proved that those prints was on that bat? A. I never touched that.

"Q. I want you to answer that question."

The record of the second hearing is represented by 224 pages of typewritten matter. No confession was obtained.

The next step taken by the State to ferret out this crime was on January 7, 1928. This was to secure the services of a detective named Carmen, who was employed by the county at $5 per day and expenses. Carmen was placed in the cell with the defendant, as a prisoner, where he remained for two days. No confession was obtained, although, according to Carmen, defendant said he killed Green in self-defense.

On January 31, 1928, there appears on the scene a high-powered detective named Barada, who was employed by the county to make clear the mysteries of this crime. He was placed in the cell with defendant under the guise of a "bank robber" who had made a rich haul and had succeeded in "getting his man." The defendant and Barada became quite good friends. A conversation arose as to the impossibility of telling the difference between human

blood and that of the lower animals. Barada, according to his testimony, advised defendant that "his attorneys were double-crossing him" about such matter. Barada, who was called by the State to show that the confession obtained from defendant was voluntary, testified:

"And I questioned him regarding the crime and he wouldn't give out any information regarding it. In the meantime I conceived an idea that I could get a confession from Mr. Green if I used the proper methods. I sent for Mr. Osmund to take me out. * *

"So shortly after Mr. Osmund came and brought me down to his office, where I met the district attorney. The district attorney asked me how I was proceeding and I told him that if he would secure a roll of bills for me I was under the impression I could secure a confession, so the district attorney got me,—I think it was fifteen hundred dollars in fives and tens and twenties. I put it in my pocket and went back upstairs and Mr. Osmund took me back. After they had locked me in I showed Mr. Green the money and I told him that I was going to buy myself out. He immediately wanted to know how I would do it and I told him that I would go in to the district attorney as soon as he returned and tell him the whole facts of the case, the crime, which I was supposed to have committed, and ask him if thirty-five hundred dollars would do me any good. That was the amount that Mr. Green was under the impression I had. He wanted to know how I would proceed and I told him that I would just walk in and lay my cards face up. I said, 'The majority of them will go for money, so if you want to get out, why, now is your time.' Later on Mr. Osmund took me out again and I returned the money to Mr. Bedingfield. I came back without the money and Mr. Green wanted to know how I made out. I told him fine, 'I am going to leave.' He says, 'You don't mean to tell me you bought your way out?'

I said, 'Certainly I bought my way out.' He said, 'How did you do it?' I said, 'I went in here, I am all wet,' as I expressed it, meaning guilty, 'Nothing to stop me from making a few thousand.' He said, 'Are you really going?' and I said, 'Yes.'

"Q. When did you go? A. I left at 4 o'clock that afternoon.

"Q. Who turned you out? A. Mr. Osmund and the jailer, Mr. Varney. * *

"Q. Well, did you promise him that anything would be done for him? A. Why, I told him that I would probably *loan him a couple of thousand dollars if he could make the grade, and would also loan him a thousand dollars to start a sanitarium for a mineral bath cure if he got out.*

"Q. Did you promise him that any officer would do anything for him? A. None whatever.

"*On Cross-examination.*

"Q. And that conversation was for the purpose of convincing Bob that the only way he could get out was to buy his way out, wasn't it? A. Exactly. * *

"Q. You told him that you had paid the district attorney, that the agreement had all been made and you were going to get out? A. After I came back without the money, yes.

"Q. And you told him that you had confessed to everything? A. Yes, sir. * *

"Q. What did you say to him about buying his way out? A. I didn't tell him what to do; I said nothing about buying his way out other than if he could arrange it I could loan him two thousand dollars if that would help him.

"Q. Where was he to get the two thousand? A. I told him that I would loan it to him.

"Q. When were you going to get it? A. That night."

Mr. Osmund, deputy sheriff, a witness for the State, in response to the question, "Who went and got the money to take up there, the roll of bills?"

testified, "Why, Mr. Bedingfield." On oral argument in this court, it was admitted by the district attorney that he knew what use the detective Barada was to make of the money.

Soon after Barada left the jail as a "discharged prisoner" the defendant made it known to the jailer that he wanted to see the district attorney. A meeting was arranged for that evening at about 8 o'clock and, on schedule time, the defendant was taken down to the sheriff's office where the district attorney was waiting. The defendant at once said: "I am guilty; will $2,000 do any good?" The district attorney spurned the offer of bribery and admonished Green that, if he decided to make any statement, it must be free and voluntary. Green signed a seven-page statement written by the district attorney describing how he killed Caleb Green. There is no evidence tending to show that the district attorney was unfair in reducing defendant's statement to writing. His written confession, so far as deemed material herein, is as follows:

"My heifer got in his field and I went up to his house to ask him to cut it out—shooting at the heifer—he took two shots at me—he shot at me with a revolver pistol. He didn't hit the heifer when he shot at her. He didn't hit me either. When he shot twice at me I ran to his door, kitchen door, and knocked the pistol from his hand. * * I was very close when he shot at me probably not over 25 feet from him when he shot the first time. I asked him to cut it out before he shot at me. * * The first thing I did was to hit Caleb Green with my fist. * * I knocked the gun out of his hand. It made him crazy. * * He came at me, I hit him in the head, that made him crazy, he was yelling. I hit him with a club; he was then so far gone I finished him with a gas pipe about three-fourths inch in

diameter; * * it was laying right there. I hit him three or four times with the gas pipe. The gas pipe was about 18 inches long. The first time I hit him I hit him with my fist; I then hit him with a stick; he grabbed an axe and came at me and I hit him with a stick; that was the second blow I struck him. That was the blow that made him crazy; it knocked him down; he fell into the house and got up and went through the window and rolled down the hill. He came at me with an axe after I knocked the gun out of his hands; it was then I hit him with the club. * * When he rolled down the hill he was screaming; he was suffering and I hated to see him suffer so I finished him up and killed him at the foot of the hill. * * ''

The district attorney in his opening statement to the jury referred to the written confession as follows:

''After this document is in evidence and proven we will then show to you that his claims made there and practically all of the statements that he made there as to self-defense and as to the reasons for his act were false.''

Was this confession—which mostly sounds in self-defense—the free and voluntary acknowledgment of guilt which the law contemplates to render it admissible in evidence? What was the impelling motive which brought it about? Was it prompted by the hope of benefit or was it actuated by the desire of the defendant to tell the truth? The nature of the inducement made to defendant to confess has much to do in determining the trustworthiness of his acknowledgment of guilt. If it was obtained in a manner and by methods reasonably likely to have caused a false statement it is to be rejected as evidence. The mere fact, in itself, that artifice, deception and falsehood were exercised in an effort to induce the accused to confess would not make the

confession inadmissible, unless of a nature or character calculated to produce a false acknowledgment of guilt. As stated in Wigmore on Evidence (2 ed.), Section 841:

" * * * the use of a trick or fraud (however reprehensible in itself) does not of itself exclude a confession induced by means of it. So far as the trick involved a promise which would tend to produce an untrue confession, it would operate to exclude,— not, however, because it was a trick (i. e. because the representations were false) but because even if true its tenor would have stimulated a confession irrespective of guilt. This principle is and always has been universally conceded."

In reference to confessions obtained through artifice or deception, also see cases cited in notes, 18 L. R. A. (N. S.) 840; Ann. Cas. 1916D, 966, and 15 Ann. Cas. 274. A different question arises, however, where, in addition to the artifice and trickery, there is hope or promise of benefit operating on the mind of the accused, of such nature as to cause him to acknowledge guilt regardless of the truth or falsity of his statement: State v. Howard, supra; 1 R. C. L. 561; Underhill's Criminal Evidence (3 ed.), § 227.

The record in this case establishes beyond reasonable controversy that the defendant believed he could obtain his liberty by confessing to this crime and bribing the district attorney. The detective not only told him that such could be done but apparently demonstrated the truth of his assertion before his very eyes. If this little drama, in which the "bank robber" played the leading part and the district attorney and deputy sheriff somewhat minor roles, was for the purpose of convincing defendant that he could get out of jail if he confessed, it was emi-

nently successful. This ignorant man was so thoroughly convinced that he had his suitcase packed ready to go home to his wife and boys. As stated in *Bram* v. *United States,* 168 U. S. 532 (42 L. Ed. 568, 18 Sup. Ct. Rep. 183), which case is cited with approval in the much later case of *Ziang Sung Wan* v. *United States,* 266 U. S. 1 (69 L. Ed. 131, 45 Sup. Ct. Rep. 1):

"The human mind under the pressure of calamity, is easily seduced; and is liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or a truth, as different agitations may prevail."

That the detective Barada combined with his artifice and deception the promise to loan the defendant money with which to bribe the district attorney and also to use in establishing a sanitarium after he got out of jail comes from his own lips.

6, 7. It is argued, however, that the promise made by Barada was by a "person not in authority" and, therefore, does not exclude the confession. Some courts apparently hold that, whatever may be the nature of the inducement or promise made to the accused, the confession is not inadmissible if made by a person not in authority. Such cases, in our opinion, are not sound and do not give proper consideration to the reason for the rule. We do not think such statement of the law can be announced as a hard-and-fast rule. If a promise is made by a "person in authority" the law presumes, on account of his relationship to the accused and being in a position to fulfill the promise, that the effect on the accused person's mind would be to deprive him of the free exercise of his will and would render any statement made by him uncertain and unreliable. Hence it would be rejected as a voluntary confession.

Upon principle and reason it would seem that a confession would be inadmissible if, in fact, it was obtained as a result of hope or promise of benefit, regardless of whether the person making the inducement was one in authority or not. As stated in Bishop's New Criminal Procedure (2 ed.), Section 1234 (3):

"One not in authority, holding out hope of favor, is in reason, to be viewed the same as one in authority, if it further appears that, in fact, his representations took effect, and swayed the mind of the person confessing."

We deduce then that, after all, the important thing to be determined is the effect the inducement had upon the accused person's mind. The only fair test, if such it may be called, which can be applied is this: Was the inducement held out to the accused such as that there is any fair risk of a false confession, for the object of the rule is not to exclude a confession of the truth but to avoid the possibility of a confession of guilt from one who is in fact innocent: *State* v. *Sherman,* 35 Mont. 512 (90 Pac. 981, 119 Am. St. Rep. 869); *State* v. *Dixson,* 80 Mont. 181 (260 Pac. 138); *Whip* v. *State,* 143 Miss. 757 (109 South. 697); *Spears* v. *State,* 2 Ohio St. 583. In Wigmore on Evidence (2 ed.), Section 831, it is said that the only rational and correct test for determining what kind of inducement suffices to exclude a confession is:

"Was the inducement of a nature calculated under the circumstances to induce a confession irrespective of its truth or falsity?"

In the instant case Barada was not believed by defendant to be a person in authority but, with the connivance and co-operation of the district attorney,

Barada was enabled to dominate the mind of Green. The district attorney, through his agent, Barada, firmly impressed upon the mind of this defendant that he could get out of jail by making a confession and paying $2,000. If the district attorney himself had promised the defendant his liberty if he would do as above stated, there could be no doubt that a confession thus obtained would be rejected. Shall we place the stamp of approval upon his accomplishing by indirection that which he would not be permitted to do directly? It is to be borne in mind that the district attorney concedes that he knew the use which Barada was to make of the roll of bills which he furnished him. It is said in Wharton's Criminal Evidence (10 ed.), Section 671:

"Whenever a promise or threat is held out in such a way as to reach the defendant, although not made to the defendant directly, it will exclude the confession."

Since society is at war with crime, this court is not disposed to allow the niceties of the law unduly to hamper officers in ferreting out crime. Justice must not be sacrificed for technicalities, archaic forms or maudlin sentimentalism. It is important that those guilty of crime should be made to realize the certainty and celerity of punishment. It is also vastly important, to the end that there be a wholesome administration of justice, that confessions be not extorted from those accused of crime by methods more in keeping with a darker age. It is a sacred principle that no one shall be compelled, or be induced under promise of immunity from punishment, to accuse himself. To uphold this confession in the light of the undisputed testimony would, in our opinion, be a perversion of justice. We do not

impugn the motives of the district attorney. He is a young man of good repute in the legal profession. It is simply a case where zeal to obtain a conviction led to error.

Under the undisputed facts in this case we are forced to the conclusion that the trial court erred in admitting this confession: *State* v. *Garrison,* 59 Or. 440 (117 Pac. 657); *People* v. *Lipsczinska,* 212 Mich. 484 (180 N. W. 617); *Ziang Sung Wan* v. *United States, supra;* Wharton's Criminal Evidence (10 ed.), Section 6221.

We see no other assignment of error which warrants a reversal.

The judgment of conviction is reversed and the case is remanded for a new trial.

REVERSED AND REMANDED.