Filed: July 19, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Respondent on Review,

v.

LANCE FRANKLIN POWELL,

Petitioner on Review.

(CC CM0621169; CA A141129; SC S059620)

On review from the Court of Appeals.*

Argued and submitted March 6, 2012.

Kenneth A. Kreuscher, Portland Law Collective, Portland, argued the cause and filed the brief for petitioner on review.

Douglas F. Zier, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Balmer, Chief Justice, and Durham, De Muniz, Kistler, Walters, and Linder, Justices.**

WALTERS, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The order of the circuit court is affirmed, and the case is remanded to the circuit court for further proceedings.

*Appeal from Benton County Circuit Court, Janet Schoenhard Holcomb, Judge. 242 Or App 645, 256 P3d 185 (2011).

**Landau, J., did not participate in the consideration or decision of this case.

WALTERS, J.

In this case, the trial court found that defendant's statements to private investigators were induced by the investigators' promises of leniency and other benefits and therefore suppressed those statements and a second set of inculpatory statements that defendant made to a police officer on the same subject, both pursuant to ORS 136.425(1).[1] The Court of Appeals affirmed the trial court's order in part and reversed it in part. We affirm the order of the trial court.

This case comes before us on an interlocutory appeal of the trial court's pretrial order of suppression. After conducting a hearing, the trial court concluded that defendant's first set of inculpatory statements were involuntary and that the coercive effect of the investigators' inducements had not been dispelled when defendant made the second set of inculpatory statements. On review, we consider the factual findings that the trial court made in support of its conclusions, and, to the extent that the trial court did not make explicit findings with regard to any pertinent fact, we presume that the trial court decided the facts in a manner consistent with those conclusions. *State v. Foster*, 303 Or 518, 529, 739 P2d 1032 (1987) (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). If we find that the evidence in the record sustains the trial court's factual findings, we do not disturb them. *Id.* However, we do not defer to the trial court's

---

[1] ORS 136.425(1) provides:

"A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats."

conclusions but decide, as a matter of law, whether defendant's inculpatory statements were involuntary and whether the trial court erred in suppressing them. *Id.*

When the material events occurred, defendant was employed as a courier for Federal Express (FedEx) in Corvallis. FedEx had instituted an internal investigation after discovering that, over a period of several months, a number of packages had gone missing from defendant's worksite. Two FedEx investigators called defendant in from his route one morning for questioning. The interview was conducted in a conference room at the FedEx worksite in Corvallis and was tape-recorded. The investigators began by telling defendant that they were questioning a number of employees in connection with the investigation. Defendant denied stealing any of the packages or knowing anything about the matter. The investigators continued to press him, but defendant repeatedly maintained that he knew nothing about the missing packages. At that point, the investigators changed tack. One of the investigators said to defendant:

"Lance, * * * we've been looking into this for a while. We've done some extra things to the station, different things to help us pinpoint what's going on. And it's apparent that you took this stuff, ok? So now we're at a crossroads here, okay? We're at a point where either we handle it in-house here, in FedEx, or we can turn everything we have over to the [police department], and then they handle it from there. Now if you choose that route, well there's nothing we can do. They'll be going to get search warrants for your house, for your mother's house. They'll go through all of your stuff. It's just gonna be a big mess, okay? * * *

"At this point, our base concern here at FedEx is we want to know, we need to make a customer happy. And if we can make the customer happy, then they don't come back on Lance, okay? And I don't think you're a bad guy, okay? If I had thought you were a bad guy I would've taken all this stuff and we would've given it to the [police department] and said, 'You guys jack him up, we're done with him,' okay? I don't feel that way. You've got a lot of stuff going on in your life right now, and I know it.

> People do boneheaded things, okay?  But where we go now is what's going to decide your future.  Can we get any of this stuff back?  Can we get it back and get it to the customer?  Nobody but who's in this room needs to know, you know.[2]  Your wife doesn't have to know, nobody has to know nothing."

At that point, defendant admitted to having some of the stolen items and agreed to take the investigators to his house to recover some of the stolen property.  On the way to his house, defendant expressed second thoughts about proceeding.  However, the investigators assured defendant that

> "it was better to let them know about everything, get everything -- get it back to the customers, and * * * it was better just to take care of this all now with us so we could just get it behind us, and that way they didn't have to bring the police into it."

Defendant let the investigators into his garage, where they recovered a number of items of allegedly stolen property.

The investigators then told defendant that they needed him to come back to the worksite with them to provide a written statement and that he would then be free to go.  Defendant accompanied the investigators back to the worksite and wrote out a statement with the assistance of one of the investigators.  Defendant testified that, as he worked on the statement, one of the investigators was in the room with him, and was "kind of letting [defendant] know what he needed to have on that statement."  When asked whether the statement was in his own words or the investigator's words, defendant responded that it was "a mix, part my words, part his words.  He was -- I wasn't sure what

---

[2]    Defendant testified that at this point in the interview, the investigator gestured towards the office of defendant's senior manager, giving defendant the impression that the investigators would not tell his supervisors and that he would not lose his job if he admitted to the thefts.

exactly needed to be done and he said 'This is what I need you to write. You need to tell me this, this, this.'" When defendant completed the statement, the investigators said that "they needed to take care of one more thing first and then [defendant] could go." One of the investigators then said to defendant, "Listen, I need you to give a statement to the police. We just need a third party to kind of document what's been said here, what's going on." The investigator assured defendant that, "It doesn't mean you're being arrested. * * * We just need you to tell them what you told us so we can have it documented."

At that point, the investigators brought a uniformed police officer into the room. The officer informed defendant that the investigators had told her about everything that had transpired up to that point but that she wanted to hear from defendant what had happened. She then read defendant his rights, but she advised him that she was doing so "just * * * as a matter of housekeeping, you know, just a formality." Defendant became "a little concerned" at that point. The officer asked defendant if he knew why she was there. Defendant responded, "Probably to arrest me."[3] The officer "kind of laughed, and said, 'Well, I, you know, appreciate your honesty.' She said, you know, 'Not necessarily.' She said 'That could be a possibility but it's ultimately up to your company

---

[3] When asked at the suppression hearing why defendant told the officer that he thought she was probably there to arrest him, defendant testified that

> "I was trying to see at that point -- because I had not said anything to her and I wanted to see if she said yes, that basically the deal was off with the FedEx representatives, or see if she basically confirmed what they were saying, that 'No, I'm not necessarily going to arrest you, I'm just here to get a, you know, third party statement documentation.'"

how they want to handle this.'" Defendant testified that one of the investigators, who remained present throughout defendant's entire interview with the officer, nodded his head in agreement with the officer's statement. Defendant then made a second set of inculpatory statements to the officer and consented to a second, more extensive search of his home by the police, which resulted in the seizure of a number of additional items of allegedly stolen property and other inculpatory physical evidence. Defendant was arrested and charged with aggravated theft in the first degree.

Defendant moved to suppress both sets of inculpatory statements and all of the physical evidence seized as a result of those statements. At the suppression hearing, the trial court heard defendant's testimony and received into evidence a tape recording of defendant's interview with the FedEx investigators. After the hearing, the trial court made the following findings of fact:

"On or about August 31, 2006, Federal Express (Fed Ex) investigators interviewed the defendant regarding a large number of missing packages. Defendant worked as a driver for Fed Ex at the time. The interview was conducted at the Fed Ex work site. Defendant initially denied stealing any of the packages. After being told that the company only wanted to get the property back to the customers and promised to handle the matter 'in house' and not involve the police, defendant agreed to cooperate and admitted that he had stolen property from the company and took investigators to his residence to recover some of the stolen items. Despite these promises, the Fed Ex investigators contacted investigators from the Corvallis Police Department which led to further interviews with the defendant and more admissions. The interview with law enforcement occurred shortly after the conclusion of the internal investigation interview at the Federal Express work site, in the presence of one of the Fed Ex investigators."

The trial court then went on to find defendant's confession to be involuntary and entered an order suppressing both sets of incriminating statements as well as the physical

evidence derived from them:

> "The question before the Court is whether or not defendant's confession was voluntary or in violation of statutory or constitutional protections. Based on the totality of the evidence presented at the suppression hearing, the court finds that defendant did not make a voluntary confession. The express and implied promises of immunity from criminal prosecution given to the defendant by the Fed Ex investigators renders [*sic*] his statements to them involuntarily [*sic*]. Because there was not a sufficient break in time or location between the Fed Ex investigation interviews and the interview by law enforcement investigators, statements made by defendant in response to subsequent interrogation and evidence seized after his involuntary confessions must also be suppressed."

The state filed an interlocutory appeal pursuant to ORS 138.060(1)(c) challenging the order of suppression.

The Court of Appeals affirmed the trial court's order suppressing the first set of statements, but reversed the suppression of the second set of statements, holding that the arrival of the uniformed police officer and the administration of *Miranda* warnings had dispelled the influence under which the initial statements were obtained. *State v. Powell*, 242 Or App 645, 658, 663, 256 P3d 185 (2011). Noting that neither party had raised any argument regarding the suppression of the physical evidence other than as derivative of the inadmissible confessions,[4] the Court of Appeals affirmed the

---

[4] As noted in the Court of Appeals opinion,

> "The state's original opening brief assigned error only to the suppression of defendant's confessions and not the physical evidence. A week before oral argument, the state filed an amended opening brief, which broadened the assignment of error to encompass a challenge to the physical evidence * * *. However, the state did not augment its brief with arguments addressing the physical evidence."

*Powell*, 242 Or App at 658. As to the admissibility of the physical evidence that derived from the second set of statements, the Court of Appeals noted that

suppression of the physical evidence derived from the first set of statements, but reversed the suppression of the physical evidence derived from the second set of statements. *Id.*

Defendant petitioned this court for review of the Court of Appeals decision reversing the trial court's suppression of the second set of statements. The state filed a contingent cross-petition for review of the Court of Appeals' affirmance of the trial court's suppression of the first set of statements. We allowed review, and, for the reasons that follow, we affirm in part and reverse in part the decision of the Court of Appeals and affirm the trial court's order of suppression in its entirety.

The controlling statute, ORS 136.425(1), provides:

"A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats."

The first version of that statute was enacted in 1864, only five years after Oregon became a state. When first enacted, the statute provided, in part:

"A confession of a defendant, whether in the course of judicial proceedings, or to a private person, cannot be given in evidence against him, when made under the influence of fear produced by threats[.]"

General Laws of Oregon, Crim Code, ch XXII, § 214, p 478 (Deady 1845-1864). As is evident from a comparison of the two statutes, the modern statute is nearly identical to its

"Defendant does not challenge the validity of his consent to a police search or the recovery of that evidence except as the fruits of an involuntary confession to the police. Thus, we have no occasion to separately analyze that issue. Accordingly, we reverse the suppression of the physical evidence obtained by the police subsequent to defendant's second confession."

*Id.* at 664.

original predecessor. Thus, case law interpreting earlier versions of that statute is highly relevant to the proper interpretation of the current statute.

In *State v. Wintzingerode*, 9 Or 153 (1881), this court interpreted that statute, then codified as section 169 of the Criminal Code (Deady & Lane 1843-1872). In that case, the defendant made inculpatory statements after a police officer told him, "'It would be better for you, Harry, to tell the whole thing.'" *Id.* at 162. The state argued that the statute applied only to threats and not to promises:

> "It is insisted on behalf of the state that this section has altered the common law rule on the subject, and that only those confessions can now be excluded which have been 'made under the influence of fear produced by threats.'"

*Id.* at 160. The court rejected that argument. The court noted that the pre-existing common-law rule on the subject clearly applied to inducements of both advantage and harm. *Id.* at 163-64. While the statute referred explicitly only to "threats," the court noted that the statute was couched in wholly affirmative terms. *Id.* at 161. Declining to imply any negative intent from those affirmative terms, the court held that the legislature did not intend that statute to abrogate the established common-law rule. *Id.* at 161-62. Instead, the court interpreted the statute as coextensive with the common-law rule:

> "There seems to be no conflict among the numerous authorities as to the rule, that confessions made by a prisoner while in custody, and induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge, are inadmissible in evidence against him.
>
> "The precise form of words in which the inducement is presented to the prisoner's mind is immaterial. It is sufficient if they convey to him the idea of temporal benefit or disadvantage, and his confession follows in consequence of the hopes thereby excited."

*Id.* at 163; *see also State v. Moran*, 15 Or 262, 265, 14 P 419 (1887) ("It must be taken as settled in this State that section 169 of the Criminal Code is only declaratory of the common-law rule in relation to confessions." (Citing *Wintzingerode*, 9 Or 153.)).

In this case, the state acknowledges that *Wintzingerode* held that the statute encompasses the common law and thus applies to confessions induced by promises of leniency as well as by threats. The state also acknowledges that, by its terms, the statute originally applied to confessions made to private persons as well as to state actors. However, the state argues that a 1957 legislative amendment to the statute (then codified as ORS 136.540(1)) restricted the statute's application to exclude confessions made to private parties. In 1957, the legislature changed the statutory wording from "whether in the course of judicial proceedings *or to a private person*," to "whether in the course of judicial proceedings *or otherwise.*" Or Laws 1957, ch 567, § 1 (emphasis added). According to the state, "the proper interpretation of the 1957 amendment is that it was intended to bring this statute in line with the constitutional provisions on compelled confessions, which require state action as a basis for exclusion." Thus, the state urges, "the newly added words 'or otherwise' were meant to modify the phrase 'in the course of judicial proceedings' and were meant to apply only to situations akin to them."

We reject the state's contention. As a preliminary matter, we note that the parties base their arguments in this court on ORS 136.425(1) and do not raise constitutional issues. Whether the state's premise -- that the Oregon Constitution does not preclude the admission of inculpatory statements that are coerced by nonstate actors -- is correct is not, therefore, an issue that is directly presented and we do not decide it.

We do consider that premise for purposes of the state's statutory interpretation argument, however, and conclude that, even if the state were correct, the 1957 amendment to the statute does not indicate a legislative intent to limit the applicability of the statute in that way.

First, it is important to understand that there can be a difference between the person who induces an involuntary confession and the person to whom the confession is made. For instance, one person may threaten to kill a defendant's child if the defendant does not falsely confess to a crime; the defendant may then confess to a different person or set of persons. When the legislature amended the statute in 1957, it explicitly addressed the circumstances in which a confession is made; it did not address the class of persons who induce the confession.[5]

---

[5] The statute bars the admission of confessions "made under the influence of" threats or promises, without any explicit limit on the class of persons whose influence may induce the confession. The lack of restriction on the source of the inducement is consistent with the common law. In *State v. Green*, 128 Or 49, 273 P 381 (1929), this court recognized that the common law did not make a distinction between inducements offered by private parties and those offered by state actors, because both may result in unreliable confessions:

"It is argued * * * that the promise made by [a private detective working undercover as a jail inmate] was by a 'person not in authority' and, therefore, does not exclude the confession. Some courts apparently hold that, whatever may be the nature of the inducement or promise made to the accused, the confession is not inadmissible if [the inducement was] made by a person not in authority. Such cases, in our opinion, are not sound and do not give proper consideration to the reason for the rule. * * * Upon principle and reason, it would seem that a confession would be inadmissible if, in fact, it was obtained as a result of hope or promise of benefit, regardless of whether the person making the inducement was one in authority or not. As stated in Bishop's New Criminal Procedure (2 ed.), Section 1234(3):

The 1957 amendment made the statute applicable to confessions made "in the course of judicial proceedings or otherwise."  Contrary to the state's argument, that text is more plausibly interpreted as broadening rather than restricting the application of the statute.  The former statute arguably applied only to two kinds of coerced confessions -- those made in the course of judicial proceedings and those made to private persons.  The 1957 amendment, however, altered the scope of the second category from coerced confessions made to private persons to coerced confessions made "otherwise" than in the course of a judicial proceeding.  When we accord the words "or otherwise" their plain meaning, it would appear that the 1957 amendment changed the statute to apply to (1) coerced confessions made in the course of judicial proceedings and (2) coerced confessions made other than in the course of judicial proceedings -- or in other words, to all coerced confessions, regardless of to whom or in what circumstances they are made.

The state argues that we should not interpret the statute in accordance with that plain meaning, however, on the basis of two canons of statutory construction.  First, the state argues that, if the legislature had intended to expand the statute to apply to all confessions, there were much simpler ways to do so, such as removing the dependent clause altogether.  That may be so; however, that particular canon could also be applied

---

"'One not in authority, holding out hope of favor, is in reason, to be viewed the same as one in authority, if it further appears that, in fact, his representations took effect, and swayed the mind of the person confessing.'

"We deduce then that, after all, the important thing to be determined is the effect the inducement had upon the accused person's mind."

*Id.* at 61-62.

against the state's position, as there also would have been much clearer ways for the legislature to express a purpose to remove confessions made to private parties from the scope of the statute, if that was indeed its intent -- for instance, by removing the text "or to a private party" *without* replacing it with an apparently broader and more general term. Second, the state argues that statutory amendments must be interpreted to have some purpose in effecting a change to the statute they amend. Because the statute applied to coerced confessions made to private persons before the amendment, the state argues that the amendment would have no purpose if we continued to interpret the statute to apply to those confessions after the amendment. The state is mistaken, however, in assuming that that is the only change the legislature could have intended the amendment to effect. Rather, the legislature also could have intended that change to broaden or clarify the statute's application to confessions made to a state actor outside "the course of judicial proceedings," for instance, to a police officer prior to an arrest or the filing of charges.

Furthermore, since the 1957 amendment, this court has continued to interpret the statute to apply to confessions made to private parties, just as it did before the amendment. In *State v. Ely*, 237 Or 329, 390 P2d 348 (1964), this court held that the statute mandated suppression of a confession made to and induced by the promises of the victim's father and the defendant's supervisors that they would not attempt to prosecute him.[6] As the court in *Ely* held, the statute simply makes no distinction between

_____

[6] Although the defendant's supervisors in *Ely* may have been state employees, insofar as they held the positions of school principal and local school board superintendent, the court in *Ely* neither noted that fact nor relied on it in any way in its holding. To the contrary, the court appeared to assume that, to the extent those persons

confessions made to or induced by law enforcement officers and confessions made to or induced by private persons:

> "A correct interpretation of our own cases, as well as those decided in the federal courts, would require the exclusion of an involuntary confession, whether made to law enforcement officers or to other persons."

*Id.* at 332. Rather, as the court held, the "fundamental question" in determining the admissibility of a confession is not to whom the confession is made, but "whether the confession is the product of the free exercise of the confessor's will." *Id.*

That interpretation is also in accord with the purpose of the statute. As we have consistently held both before and after the 1957 amendment, the purpose of the common-law rule and the statute that now embodies it is to exclude potentially false -- and thus unreliable -- confessions from evidence. *See, e.g.*, [State v. Davis](), 350 Or 440, 452, 256 P3d 1075 (2011) ("The rationale was that coerced confessions were not reliable; the common law, it was understood, 'carefully scrutinizes the circumstances, and rejects the evidence if it sees that no safe inferences can be drawn from it.'" (Quoting *People v. McMahon*, 15 NY 384 (1857).)); *State v. Smith*, 301 Or 681, 693, 725 P2d 894 (1986) (holding that "the key to the 'free and voluntary' character of the confession is the inducement made to the defendant -- was there any promise or threat made to the defendant which would elicit a false confession"); *State v. Mendacino*, 288 Or 231, 236,

were not law enforcement officers, they were acting in a private capacity for the purpose of the statute. *See Ely*, 237 Or at 331-32 (rejecting the state's argument that the confession was admissible because it "was made when the defendant was not in custody, and *was made to private citizens*," on the grounds that "[a] correct interpretation of our own cases * * * would require the exclusion of an involuntary confession, *whether made to law enforcement officers or to other persons*." (Emphases added.)).

603 P2d 1376 (1979) ("A compelled confession is offensive not because the victim has a grievance against the police, but because coerced statements are not premises from which a civilized society will infer guilt."); *State v. Green*, 128 Or 49, 62, 273 P 381 (1929) (holding that "the object of the rule is not to exclude a confession of the truth but avoid the possibility of a confession of guilt from one who is in fact innocent"). As our cases consistently have recognized, confessions are unreliable when rendered under circumstances in which the confessor perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession. Whether the person offering the benefit or threatening the detriment or the person to whom the confession is made are state actors or private persons is not, in itself, determinative of the reliability of the confession. We decline the state's invitation to read ORS 136.425(1) to pertain only to confessions induced by and made to state actors. The text of the statute does not require that interpretation, our case law consistently has made no such distinction, and such a distinction would undermine the purpose of the statute. Consequently, we hold that ORS 136.425(1) continues to apply to confessions induced by and made to private parties. We turn now to the question of whether the lower courts properly applied the statute to the particular facts of this case.

With regard to the first set of statements, the state argues that the trial court should not have suppressed those statements, because the promises of leniency extended to defendant by the FedEx investigators were not sufficiently compelling to render those statements involuntary. The state contends that, although promises of leniency advanced by state actors are sufficiently compelling to result in an impermissible risk of false

confession "because those state actors control whether and what charges might be brought," similar promises offered by a private party do not have the same coercive force. Consequently, the state argues, the inducements offered by the FedEx investigators were insufficiently coercive to render the statements inadmissible under the statute.

We agree with the state that the statute requires an individualized inquiry into whether the alleged inducement was sufficiently compelling to influence defendant's decision to confess. The statutory text forbids the admission of confessions only when they are "made under the influence of" an improper inducement. However, the statute sets forth the same standard for all confessions within its scope, without regard to whether the inducements were advanced by private parties as opposed to state actors. A private party may hold a gun to a defendant's head or exert other nonphysical authority over a defendant that may have a coercive effect. If an inducement advanced by a private actor is sufficiently compelling to influence a person's decision to make an inculpatory statement, the statute forbids the admission of that statement to the same extent that it would if the inducement had been advanced by a state actor. The inquiry before us here, then, is whether the trial court erred in deciding that the inducement at issue was sufficient under the circumstances to influence defendant's decision to make inculpatory statements. For the reasons that follow, we conclude that it did not.

Although the FedEx investigators were private parties and, as such, did not have actual authority to decide whether the state would bring criminal charges against defendant for the thefts, they did have other coercive power. The coercive effect of the FedEx investigators' promises to handle the matter "in-house" and not to turn defendant

over to the police or notify the affected customers of his involvement in the thefts was similar to the coercive effect of the promises at issue in *Ely*. In that case, we noted that the "defendant could have believed that if these three men would not prosecute him no one else was likely to do so." 237 Or at 334. As in *Ely*, although the FedEx investigators did not have any official power to decide on behalf of the state whether to prosecute defendant for a crime, defendant here likely believed that if they refrained from pressing charges for the thefts, no one else would do so either.

As was implicit in our analysis in *Ely*, the promise of avoidance of what otherwise appears to be imminent criminal prosecution may provide a compelling inducement for even an innocent person to confess. As an initial matter, avoiding criminal prosecution altogether would relieve an innocent person of the worry of being wrongly convicted -- a real possibility which would weigh heavily upon even the cleanest conscience. In addition, a number of detrimental consequences accompany a criminal prosecution, even one that eventually results in a not guilty verdict. Regardless of guilt or innocence, there may be public records of the accusation and the arrest, time spent in jail before going to trial or obtaining bail, potential media coverage or social or reputational consequences, and the expense of obtaining counsel, in addition to the significant amount of personal time, stress, and energy that must be devoted to defending oneself against criminal charges. Here, the FedEx investigators made clear that defendant would suffer those sort of detrimental effects if they involved the police when they told him that if they turned the case over to the police, "[t]hey'll be going to get search warrants for your house, for your mother's house. They'll go through all of your

stuff. It's just gonna be a big mess, okay?" The promise of avoidance of that invasion of privacy and humiliation of defendant and his family constitutes a compelling inducement to confess. The state's contention that the promise of avoiding criminal prosecution is insufficiently compelling to induce a confession is without merit.

In addition, the FedEx investigators also held out other compelling benefits unrelated to defendant's criminal prosecution, over which they did have control, by telling defendant that, if he cooperated with their investigation, "[n]obody but who's in this room needs to know" about the thefts. That statement had two implications, both of which were made explicit by the investigators' words and conduct. First, that statement, in combination with the investigator's gesture towards defendant's supervisor's office, indicated that defendant likely would keep his job if he agreed to cooperate with the investigation. Second, that statement indicated that defendant's cooperation could prevent his wife from finding out about his alleged involvement in the thefts. The state does not convince us that those promises were insufficiently compelling as a matter of law. Those were compelling benefits when offered in exchange for defendant's confession, especially when coupled with the additional assurance that a confession would not result in criminal prosecution. Those promises were sufficiently compelling to induce a confession.

Finally, the record in this case shows that, until the investigators extended those promises to him, defendant had staunchly denied any knowledge of or involvement in the thefts. It was only after the investigators told him that if he did not confess they intended to take their accusations to the police, his supervisors, and his wife that

defendant admitted to his involvement in the thefts and agreed to permit the investigators to search his house to recover the allegedly stolen items. Indeed, on the way to his house, defendant began to have second thoughts about cooperating and had to be again induced with further threats of police involvement to secure his continued cooperation with the private investigation.

It is well established that confessions are initially deemed to be involuntary and that the state has the burden to overcome that presumption by offering evidence affirmatively establishing that the confession was voluntary. *See, e.g.*, *Smith*, 301 Or at 693 (holding, based on an extensive review of Oregon case law, that confessions are "initially deemed to be involuntary and the burden is upon the state to prove that it was voluntary"). In this case, the trial court concluded that the state had failed to carry its burden of proving that defendant's first set of inculpatory statements were not "made under the influence of" those threats and promises and therefore concluded that defendant's confessions to the Fed Ex investigators were involuntary. The record supports that conclusion. The trial court did not err in reaching that conclusion and suppressing defendant's first set of statements under ORS 136.425(1).

We turn next to the issue of whether the trial court erred in suppressing defendant's subsequent statements to the police officer and the state's arguments that the trial court erred in that regard. First, the state argues that those statements could not be suppressed as derivative of the first inadmissible statements, because there was no underlying illegality or violation of defendant's rights to exploit. The first statements, the state contends, were obtained as a result of legal, private conduct. Second, the state

argues that those statements also could not be suppressed by the direct application of the statute, because, at the time that defendant made the second set of statements to the police officer, the circumstances had changed sufficiently to dispel the influence of the prior inducements offered by the FedEx investigators.

The Court of Appeals agreed with the state that the second set of statements could not be suppressed as derivative of the first set of statements, on the grounds that

"[h]ere, there was no predicate violation of defendant's constitutional rights. Nor was there any predicate unlawful conduct by the police or, for that matter, anyone. * * * We know of no case where a judicially created exploitation analysis has been applied to evidence obtained as a result of private conduct, much less private conduct that is not unlawful itself."

*State v. Powell,* 242 Or App 645, 658, 660, 256 P3d 185 (2011). Rather, the Court of Appeals held, "the question is whether ORS 136.425(1) itself requires exclusion of the second confession because that confession was made 'under the influence of [the same] fear' or hope that induced the first confession." *Id.* at 661 (alteration in original). In that regard, the Court of Appeals held that ORS 136.425(1) did not require suppression of the second set of statements, because "the arrival of the officer and the warnings administered to defendant were sufficient to dispel the 'delusive hopes * * * under the influence of which the original confession was obtained.'" *Id.* at 663 (citing *State v. Wintzingerode*, 9 Or 153, 164 (1881)) (alteration in *Powell*).

We need not reach the state's first argument, because we conclude that the statute itself requires exclusion of the second set of statements unless the state proved that the improper coercion that compelled the first set of statements had been dispelled before the second set of statements were made. We derive that standard from the court's

construction of the statute in *Wintzingerode*:

> "[A]lthough an original confession may have been obtained by improper means, yet subsequent confessions of the same or of like facts, may be admitted, if the court believes that from the length of time intervening, or from proper warning of the consequences of confession, or from other circumstances, that the delusive hopes or fears, under the influence of which the original confession was obtained, were entirely dispelled. * * * [I]n the absence of any such circumstances, the influence of the motives proved to have been offered will be presumed to continue and to have produced the confession, unless the contrary is shown by clear evidence, and the confession will therefore be rejected."

9 Or at 164-65 (internal quotation marks omitted). As that standard makes clear, confessions made subsequent to an improperly induced confession on the same subject are presumptively inadmissible under the statute. To overcome that presumption, the state must offer "clear evidence" sufficient to prove that, at the time of the subsequent confession, "the delusive hopes or fears, under the influence of which the original confession was obtained, were entirely dispelled." *Id.* When applying that standard to subsequent statements, a court by definition will already have determined that the initial inducements were sufficiently coercive to render a resulting confession unreliable and that the defendant made those statements as a result of those inducements. Thus, the only question that remains is whether those inducements continued to influence the defendant's motive to confess.

The state argues that defendant's second set of statements was voluntary, because the arrival of the police officer and the administration of *Miranda* warnings prior to defendant's second set of statements must have dispelled the improper influence that induced defendant's previous statements. We disagree.

The arrival of the police officer and the administration of *Miranda* warnings could, under some circumstances, have operated to alert defendant that he could no longer rely on the FedEx investigators' promises not to press criminal charges against him. Here, however, the FedEx investigators had specifically assured defendant that the officer was there only to provide a "third party documentation" of the incident, not to investigate a crime. When defendant expressed his suspicions that, notwithstanding those assurances, the arrival of the police officer meant that "the deal was off" and that he was going to be arrested, the officer also assured him that the deal was *not* off -- that he was "not necessarily" going to be arrested and that "it's ultimately up to your company how they want to handle this." As the officer made those statements, one of the FedEx investigators nodded along with her words, thus confirming that defendant's continued cooperation would still be rewarded with the promised benefits. Those facts support the trial court's conclusion that the arrival of the police officer did not dispel the coercive effect of the prior inducements.

Similarly, although *Miranda* warnings may in some cases serve to dispel coercive influences and thus increase the likelihood that a subsequent confession is actually voluntary, the trial court concluded that, under the circumstances of this case, the *Miranda* warnings did not have that effect. Certainly, as the Court of Appeals pointed out, there is no indication that the *Miranda* warnings that the police officer administered were defective or incomplete in any way. We can assume, therefore, that those warnings served their informative prophylactic purpose. *See State v. Vondehn*, 348 Or 462, 481, 236 P3d 691 (2010) ("When the police give *Miranda* warnings at the time that they are

first required, the constitution does not demand that the state establish that the warnings were effective. The state need only establish that the police recited the warnings completely and coherently."). However, the fact that the officer administered *Miranda* warnings does not necessitate a conclusion that any subsequent inculpatory statements were voluntary. As this court noted in *Vondehn*, "[v]oluntariness of course is always a requirement for admission of a defendant's incriminating statements. Even warned statements may be inadmissible if they are not otherwise voluntary." *Id.* at 481 n 9. Where, as here, the issue is statutory rather than constitutional, and the alleged defect is actual involuntariness as the result of actual coercion, *Miranda* warnings have significance only to the extent that they in fact had an appreciable effect in dispelling the operation of the prior coercive influences on defendant's mind. When the context or manner in which the officer gives the warnings downplays or minimizes their significance in defendant's mind, their effectiveness in serving as a causal break for the purpose of the voluntariness inquiry may be correspondingly compromised.[7] Here, the officer's comments, assuring defendant as she administered the *Miranda* warnings that they were just "a matter of housekeeping" and just "a formality" and that "it's ultimately

---

[7]     This court recently made a similar point in *State v. Jarnagin*:

> "When defendant agreed to * * * waive his *Miranda* rights, he was not in custody or compelling circumstances. In that respect, [the officer] correctly suggested that *Miranda* warnings were not necessary * * *. However, the *Miranda* warnings also played a role in breaking the causal connection between the *Miranda* violations the day before and defendant's [subsequent] statements * * *. In that respect, [the officer's] statement downplayed the warnings' significance."

351 Or 703, 723 n 16, 277 P3d 535 (2012).

up to your company how they want to handle this" negated the dispelling effect that the warnings otherwise may have had. That evidence supports the trial court's conclusion that the administration of the *Miranda* warnings in this case did not dispel the coercive effect of the prior inducements.

As noted, the state has the burden to produce evidence that the coercive influences under which the prior confession was made had sufficiently dispelled to render the subsequent confession independently voluntary. *Wintzingerode*, 9 Or at 165 ("[T]he influence of the motives proved to have been offered will be presumed to continue and to have produced the confession, unless the contrary is shown by clear evidence[.]"); *see also Ely*, 237 Or at 332 ("In this state, confessions and admissions are initially deemed to be involuntary. Before either can be received in evidence, the state has the burden of showing that it was voluntarily made, without the inducement of either fear or hope."). The trial court considered the evidence that the state produced and concluded that the coercive influence of the FedEx investigators' promises was still operating when defendant made the subsequent statements. The trial court did not err in reaching that conclusion or in suppressing those statements under ORS 136.425(1).

The trial court also suppressed the physical evidence seized during each of the two searches of defendant's home, as derivative of the involuntary statements. As we noted above, neither party made any independent argument regarding the suppression of the physical evidence before the Court of Appeals, nor has either done so in this court. Rather, both parties appear to concede that the suppression of the physical evidence is

entirely dependent on the suppression of the statements from which it derived.[8]  In the absence of any argument by the state that the physical evidence should be admitted notwithstanding the suppression of defendant's statements, we decline to disturb the trial court's ruling on the matter.

The decision of the Court of Appeals is affirmed in part and reversed in part.  The order of the circuit court is affirmed, and the case is remanded to the circuit court for further proceedings.

---

[8]    We express no opinion as to the wisdom of that concession.  Indeed, ORS 136.425(1) includes no explicit prohibition on the admission of derivative physical evidence, and we know of no case in which the exclusionary rule has been applied, in the absence of a constitutional violation, to physical evidence derived from a statutorily excluded confession.