Argued and submitted September 13, 2016, at St. Mary's Academy, Portland; convictions on Counts 2, 3, and 4 reversed and remanded, otherwise affirmed April 26, 2017

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JASON KENNETH HOGELAND,
*Defendant-Appellant.*

Douglas County Circuit Court
12CR2043FE; A157596

395 P3d 960

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. With her on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Susan Yorke, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Sercombe, Presiding Judge, and DeHoog, Judge, and Flynn, Judge pro tempore.

## DEHOOG, J.

A jury found defendant guilty of assault in the second and third degree and criminal mistreatment in the first degree based, in part, on defendant's admissions that he had shaken his infant son. Defendant appeals the resulting judgment of conviction, raising two assignments of error. First, defendant contends that the trial court erred in denying his motion to suppress his admissions, because, in defendant's view, they were involuntary under ORS 136.425(1) and the Oregon and United States constitutions. Second, defendant argues that the trial court plainly erred in failing to instruct the jury that it could not consider his statements without first finding that he had made them voluntarily. We conclude that the trial court erred in admitting defendant's admissions, because they were induced by promises or "made under the influence of fear produced by threats[,]" ORS 136.425(1), and, therefore, inadmissible. In light of that conclusion, we do not address defendant's second assignment of error. Accordingly, we reverse and remand.

The material facts are undisputed. Defendant was a stay-at-home parent. One day, when defendant was home alone caring for his son, he called his wife at work because their child was not responsive. She returned home and, shortly thereafter, their child was taken to the hospital, where an emergency medical examination disclosed that the child had suffered head injuries consistent with shaken baby syndrome. Following that assessment, Jenkins, a case-worker for the Department of Human Services (DHS), contacted defendant and told him to go to the police station for an interview. The following morning, defendant drove with his mother to the police station, where he was interviewed by Jenkins and Officer McGarvey of the Sutherlin Police Department.

McGarvey and Jenkins spoke to defendant in a small, sparsely furnished interview room with the door closed. Even though defendant was not handcuffed or otherwise physically restrained and, in fact, McGarvey told him that he was free to go, McGarvey advised defendant of his *Miranda* rights. McGarvey explained to defendant that he

was being interviewed "[b]ecause [his] child was so young and—taken up to a hospital because of injuries," and "we want to make sure that there's nothing going on that's criminal." McGarvey questioned defendant for several minutes regarding the cause of his son's injuries; defendant responded that he did not know their cause.

McGarvey left the room briefly, while Jenkins continued to question defendant. Upon returning, McGarvey told defendant that he was in trouble, because the evidence clearly showed that he was responsible for his son's injuries. McGarvey said, "We need to talk about some things. I have to actually before I can make final decisions on certain things; I've got to know what kind of person I'm dealing with here." McGarvey pressed defendant to explain why he had injured his son, specifically asking whether defendant had "set out to kill" his child or, instead, "accidentally shook his kid too hard." McGarvey explained to defendant that "[T]he crime has already been established. * * * I establish the person and what they've committed at what level." McGarvey added that defendant needed to tell him "the honest truth * * * was it an accident, or was it on purpose, because *if it's on purpose*, I'll tell you right now, * * * *that is bad. That's something I need to strongly look into* * * * [a]nd you will not only have the chance of having your baby taken out of your life forever, but you will also be looking at a long time." (Emphases added.)

McGarvey elaborated, telling defendant that he needed to know if "an accident has happened. A person has made a bad choice. *Do we convict* this person and make them a huge [example] for the world to see? *No.* We make sure this person has help." (Emphases added.) As further encouragement, McGarvey made up a story for defendant, claiming that he himself had once picked up his son

> "out of anger and my wife caught me. I had anger issues. I went to anger management.
>
> "* * * * *
>
> "It didn't say [sic] that I could not see my son, and I still see my son. I raised him. [I didn't] call[] myself a monster. I just said that I needed help."

McGarvey continued to push defendant for an explanation. He asked, "Is somebody going to believe you when you say, 'I didn't do it,' or is somebody going to believe you when you say, 'I didn't do it on purpose'?" McGarvey assured defendant that "Nobody's trying to remove the child from your custody" and that "You're going to be able to see your child some day, * * * and it's going to be soon. * * * But don't you think you need the help?" He encouraged defendant to "Tell me we've established it's on accident and not [on] purpose. But you need to tell me what happened so I can—I can start the healing process. Don't you care about your son?" Despite McGarvey's persistence, defendant continued to deny that he had caused his son's injuries.

McGarvey reasoned with defendant that, if he had not caused the injuries to his son, then his wife must have caused them, because she was the only other person who had recently cared for their child. Jenkins echoed that theme, stating, "[I]f you didn't shake your son, then it possibly may be your wife * * *. I cannot leave [your child] with [your wife] if I don't know who did th[is] to him, so I'm going to have to put him in stranger foster care." McGarvey reminded defendant that he and his wife were the only two people who could have injured his child and explained that, if defendant did not admit that he had done it,

"both of you would have to be going through the whole same process. You'd both get to go to court. Your wife would probably lose her job working at the circuit court because she is now going in to trial for having child injuries. * * * It d[oes]n't sound right to me, a husband should stand up for his wife. Either, A, you do know that your wife did this and you're protecting your child—

"* * * * *

"—or B, you can clear your wife and say that you did this to your child."

In response, defendant asked, "So I have to say that I did something * * * to save my wife?" McGarvey replied, "No. * * * I don't want you to do that either, because now you're going to set it up saying that you were coerced into this." He added, "I don't want you to sit here and lie. I don't want you to [fall on your sword]. If your wife did this, I want you to

tell me, 'My wife did this and I'm trying to cover up for her because I don't want her getting in trouble.'"

An hour or so into the interview, defendant acknowledged that he had, in fact, shaken his son and that he "need[ed] help." McGarvey formally arrested defendant, placing him in handcuffs and again advising him of his *Miranda* rights. McGarvey then led defendant into a larger room and brought in his mother. As soon as his mother entered the room, defendant apologized and told her, "I got scared. I was frustrated and I shook the baby. * * * I didn't mean to do this."

The state charged defendant with criminal mistreatment in the first degree and assault in the first, second, and third degrees. Before trial, defendant moved to suppress his statements on the ground that they had been involuntary. Defendant argued that McGarvey's interview tactics had effectively given him only "two choices"—either admit that he had purposely injured his son or admit that he had done so accidentally—and had conveyed that McGarvey would accept no other explanation. Defendant further argued that McGarvey and Jenkins had unlawfully used both a promise of leniency and threats against his family to induce his confession. Following the suppression hearing, however, the trial court issued a short letter opinion, in which it concluded that defendant's statements had been voluntary. Accordingly, the court denied defendant's motion to suppress.[1] The court noted, however, that the ultimate question of voluntariness would be for the jury to decide.

Defendant's theory at trial was that McGarvey and Jenkins had coerced him into falsely admitting that he had shaken his child. Although the jury acquitted defendant of the first-degree assault charge, it convicted him of the remaining charges. This appeal followed.

Defendant's arguments on appeal largely reprise those that he made to the trial court. Defendant contends that (1) McGarvey's questions suggested a false distinction between defendant *intentionally* injuring his son by

---

[1] In its letter opinion, the trial court noted that a transcript and recording of the police interview were in evidence and that the court, therefore, need not include specific findings regarding that interview.

shaking him and *accidentally* injuring his son by shaking him, both of which were crimes; (2) McGarvey implicitly promised defendant leniency in exchange for an admission when he suggested that, if defendant had injured his son accidentally, defendant would receive treatment; and (3) McGarvey and Jenkins expressly threatened adverse consequences for defendant's wife and son if he maintained his innocence. Defendant argues that those tactics rendered his admissions involuntary and, therefore, inadmissible under ORS 136.425(1) and the state and federal constitutions. In response, the state asserts that the mere suggestion that defendant would receive treatment if he had injured his son accidentally cannot be deemed an implicit promise of leniency, because McGarvey neither suggested that defendant would receive treatment *in lieu of* prosecution nor conditioned any such treatment on defendant *admitting* criminal conduct. Thus, the state reasons, McGarvey's tactics involved no improper quid pro quo. The state further contends that, to the extent that McGarvey's and Jenkins's statements about defendant's family exerted any psychological pressure on him, it did not rise to the level of improper inducement.

We first consider whether the trial court's admission of defendant's statements violated ORS 136.425(1). *See State v. Foster*, 303 Or 518, 526, 739 P2d 1032 (1987) (courts should decide cases on subconstitutional grounds when possible). As noted, the facts material to that assessment are not in dispute. Accordingly, we focus on the trial court's conclusion that defendant's statements were voluntary, which we review for legal error. *See State v. Belle*, 281 Or App 208, 210, 383 P3d 327 (2016).

Under ORS 136.425(1), "[a] confession or admission[2] of a defendant *** cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats." Although ORS 136.425(1) only expressly references threats, the Supreme Court has held that the statute prohibits "inducement through fear *or*

---

[2] By its terms, ORS 136.425(1) applies to both confessions and admissions. Neither party relies on any distinction between confessions and admissions as far as defendant's statements are concerned, and we use those terms interchangeably in this opinion.

*promises*[.]" *State v. Mendacino*, 288 Or 231, 235, 603 P2d 1376 (1979) (emphasis added). The goal of ORS 136.425(1) is to exclude confessions that are involuntary and, hence, unreliable. *State v. Powell*, 352 Or 210, 222, 282 P3d 845 (2012); *Belle*, 281 Or App at 213. Confessions are unreliable when the person making the confession "perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession." *Belle*, 281 Or App at 213 (internal quotation marks omitted).

Whether an unlawful threat or promise renders a statement unreliable "requires an individualized inquiry" that takes into account the "detrimental consequences" that a person might avoid, as well as any "compelling benefits" that a person might receive, in exchange for confessing. *Id.* (internal quotation marks omitted). Ultimately, the test for voluntariness is whether, under the totality of the circumstances, the confession is the product of an essentially free, unconstrained, and informed choice, or whether a person's capacity for self determination is critically impaired. *State v. Ruiz-Piza*, 262 Or App 563, 573, 325 P3d 802 (2014).

Finally, under ORS 136.425(1), admissions are presumed involuntary. *State v. Ely*, 237 Or 329, 332, 390 P2d 348 (1964). Thus, it is the state's burden to show, by a preponderance of the evidence, that any statement it offers into evidence was made voluntarily. *Id.*

We begin with defendant's contention that his confession was induced by an unlawful promise of leniency premised, in part, on a false distinction between causing an intentional injury and causing an accidental injury. As we understand defendant's argument, he contends that, by suggesting that the two were materially different, with the consequence of an accidental injury being treatment rather than imprisonment, McGarvey induced his confession with an implicit promise of leniency. *See id.* at 334 (a confession induced by a promise of immunity from prosecution is involuntary as a matter of law); *State v. Pollard*, 132 Or App 538, 543, 888 P2d 1054, *rev den*, 321 Or 138 (1995) (same).

A promise of leniency may be express or implied. *Pollard*, 132 Or App at 544. "The precise form of words in

which the inducement is presented *** is immaterial. It is sufficient if [the inducement] convey[s] to [a person] the idea of temporal benefit or disadvantage, and [that the person's] confession follows in consequence of the hopes thereby excited." *Id.* (internal quotation marks omitted); *see Ruiz-Piza*, 262 Or App at 576 (noting "[t]hat the officers never explicitly made a promise of leniency or immunity is not dispositive"). In this case, defendant does not suggest that McGarvey expressly promised him immunity from prosecution in exchange for a confession. Instead, defendant contends that McGarvey's interrogation tactics conveyed an implicit promise that he would receive treatment rather than punishment if he admitted to hurting his son. We agree.

During the interrogation, McGarvey contrasted two potential outcomes that, collectively, conveyed a strong impression that defendant would not face prosecution if he acknowledged that he had shaken his son. McGarvey's questioning suggested that the outcome of the investigation was largely in defendant's control and, as noted, depended on whether defendant had "set out to kill" his son or merely "accidentally shook his kid too hard." If the former—a purposeful act—then "that [would be] bad," and defendant would be "looking at a long time" and face losing his child forever. But if the latter—a mere accident—then, McGarvey implied, the repercussions would be far less severe. In fact, when posing the hypothetical situation of an accident resulting from a person's "bad choice," McGarvey expressly told defendant that such a person would not be convicted but would, instead, get "help" from the state. And, in an apparent effort to emphasize the benefit of taking the "accident" route, McGarvey told defendant that he himself had once mistreated his own son, and yet he had not suffered adverse consequences. In McGarvey's fictitious story, he had been caught handling his child in anger, he had admitted a need for help, and, following—or perhaps during—appropriate treatment, he went on to raise his son. In sharing that tale, McGarvey necessarily conveyed the impression that things would be much better for defendant if he admitted a need for help and accepted treatment.[3]

---

[3] The state argues that McGarvey's story could not reasonably have suggested to defendant that he would avoid prosecution if he admitted to injuring

The state contends, however, that there are two reasons that McGarvey's interview tactics cannot be viewed as promising leniency. First, the state notes that McGarvey told defendant that a "crime [had] already been established" and that what remained for him to determine was the level of the crime. Thus, in the state's view, McGarvey did not promise treatment in lieu of prosecution. *See Pollard*, 132 Or App at 543 (only a promise of treatment made in lieu of prosecution may render a resulting confession involuntary). Second, the state argues that defendant's admissions cannot have been induced by any implicit promise that McGarvey may have conveyed, because McGarvey did not condition leniency on defendant making an admission. *See id.* at 548 (a promise cannot induce an admission in the absence of a contemporaneous quid pro quo); *State v. Capwell*, 64 Or App 710, 716, 669 P2d 808 (1983) (same).

We are not persuaded by either argument. For one thing, McGarvey quickly followed his assertion that a crime had been established with the assurance that a person who just "made a bad choice" would *not* be convicted but would, instead, receive help. In light of his other statements, McGarvey's announcement that a crime had been established at most created an ambiguity. As the party with the burden of proving that defendant's statements were voluntary, the state bears the consequence of that ambiguity. *See Ely*, 237 Or at 335 (concluding that, where conflicting inferences could be drawn from the evidence, the state had "failed to show that the confession was, *prima facie*, a voluntary one"); *compare State v. Bounds*, 71 Or App 744, 747, 694 P2d 566, *rev den*, 299 Or 732 (1985) (concluding that, where the defendant had expressly been told that "there would be charges," regardless of whether he admitted to certain

his son accidentally, because McGarvey did not say that his son had been injured, and because McGarvey said he had been caught by his wife, not law enforcement. As we discuss below, in the context of the interrogation as a whole, McGarvey's story implied that defendant would not be prosecuted if the injuries to his son were accidental. *See Ruiz-Piza*, 262 Or App at 574 n 4 (noting, in the context of an officer's statements that the defendant's child's medical care depended on the defendant admitting culpability, that, even though the "defendant might have, in circumstances more conducive to contemplation, realized that whether he confessed could not logically bear on the treatment his daughter received[,]" the "officers had exploited the vulnerability of the defendant" (internal quotation marks omitted)).

conduct, the district attorney's statement that he would not "'crucify'" the defendant if he confessed did not amount to a promise of leniency), and *State v. Neblock*, 75 Or App 587, 589, 706 P2d 1020 (1985) (the defendant was not induced to confess by a promise of leniency where he had been told that both treatment and incarceration were among the options the court would consider and that "'taking responsibility for one's own behavior' would simply be one variable bearing on the court's choice among options"), *with Pollard*, 132 Or App at 548-49 (noting, in concluding that the defendant had been induced to confess by implicit promises of leniency, that the defendant had not been told that he would face charges regardless of whether or not he confessed). Thus, whether McGarvey's statements are viewed as a promise of a less severe outcome or as a promise of no punishment whatsoever, defendant likely understood those statements as offering him some benefit in exchange for his admissions. *See Belle*, 281 Or App at 213 (confessions are unreliable when made under the belief that confessing will garner some benefit).

Furthermore, for closely related reasons, the quid pro quo underlying McGarvey's questions and statements—admit to what you have done and things will go better for you—would likely have been apparent to any person in defendant's position. That is, by explicitly tying treatment to an acknowledged need for help, McGarvey signaled to defendant that the possibility of receiving treatment and avoiding severe consequences depended wholly on his willingness to admit that he had accidentally injured his son. McGarvey told defendant that, if he made such an admission, he could "start the healing process," but that, if he denied responsibility altogether, no one would believe him. Taken together, those statements necessarily conveyed to defendant that he might avoid incarceration, but only if he made an admission. *See Ruiz-Piza*, 262 Or App at 576 (noting that the officer's "obvious intent in drawing a distinction between the two alternatives was to induce defendant to confess to less-serious conduct than it would be assumed that he had committed in the absence of a confession"). In that context, the quid pro quo inherent in McGarvey's proposal was clear.

We turn next to defendant's contention that McGarvey and Jenkins threatened his wife and his child and that those

threats, like McGarvey's promises, induced his confession. As defendant notes, we have previously held that threats against a person's family can rise to the level of inducement under ORS 136.425(1). For example, in *Ruiz-Piza*, as in this case, the defendant brought his child to the hospital after she sustained injuries consistent with shaken baby syndrome. *Id.* at 564, 566. During a subsequent interrogation regarding those injuries, a detective told the defendant that his child's recovery depended on his admission that he had caused her injuries. *Id.* at 568-70. On appeal of an order suppressing the defendant's resulting confession, we explained that

> "[w]hat the officers did * * * was cultivate and leverage defendant's fear that, unless he admitted to shaking her, [his daughter's] medical care would suffer. * * * Having made clear that [his daughter] had serious medical issues that could have been ameliorated by a confession—an assertion that, as a matter of medical fact, is without any support in the record—the officers also appealed to defendant's paternal responsibilities, his religion, stated that defendant was the *only* one who could help [his daughter], and stated, in effect, that the way to provide that help was to tell the officers that he had shaken her."

*Id.* at 574-75 (emphasis in original). We concluded that that approach constituted a threat that, in conjunction with the officer's other statements, induced the defendant's confession, rendering it inadmissible under ORS 136.425(1). *Id.* at 576.

Although, in the present case, McGarvey and Jenkins did not imply that the life of defendant's child could depend on his confession, they nonetheless leveraged his sense of family obligation in a manner analogous to the officer's approach in *Ruiz-Piza*. McGarvey told defendant that, if he would not admit to injuring his child, his wife would become a target of the investigation and "probably lose her job" as a result. And, by telling defendant that his wife would go to trial with him, McGarvey conveyed the message that, if the state could not establish that defendant had caused his child's injuries, his wife would face the blame. McGarvey appealed to defendant's duties as a husband to prevent that fate from befalling her, telling him that "a husband should

stand up for his wife." Jenkins echoed McGarvey's comments about defendant's wife and added an appeal to defendant's paternal instincts, telling him that, if he did not confess, she would have to put his son in "stranger foster care." As in *Ruiz-Piza*, those comments targeted defendant's vulnerabilities as a husband and father. *See id.* at 574-75. And, as in that case, McGarvey's and Jenkins's statements had the effect of informing defendant that the only way to avoid that harm to his family was to confess, regardless of whether he had actually caused his son's injuries. We see little significance in McGarvey's subsequent statement that he did not want defendant to take the fall for his wife, because, by then, McGarvey's and Jenkins's emotional pleas would likely have taken their toll.

The state, relying on *State v. Bates*, 92 Or App 385, 387-88, 758 P2d 421, *rev den*, 307 Or 170 (1988), contends that McGarvey's and Jenkins's "truthful references" to the likely consequences for defendant's wife and son if defendant did not confess cannot be considered unlawful inducements. We disagree.

In *Bates*, a case not decided under ORS 136.425(1), the defendant confessed to burglary during an interrogation in which an officer told him that he "would have to question his mother and brother if the incident was not resolved." *Id.* at 387. We concluded without further discussion that the officer's threat "to question defendant's relatives about the burglary, which he had a right to do * * * did not constitute coercion and d[id] not render defendant's subsequent statements involuntary." *Id.* at 388. To the extent that *Bates* has any relevance to our analysis under ORS 136.425(1), it is readily distinguishable from this case. In that case, the trial court found that the officer had merely threatened to question the defendant's relatives, not arrest them as the defendant had contended. *Id.* at 387-88 (stating that trial court made implicit credibility finding to that effect). Further, in concluding as a matter of law that the officer's "'threat'" to conduct that questioning did not constitute coercion, we did not consider whether that threat may have caused the defendant to "perceive[] that he * * * [might] avoid some detriment by confessing[,]" *Belle*, 281 Or App at 213 (considering

that possibility without regard to whether investigating officer lawfully could or could not do what was threatened). *See Bates*, 92 Or App at 387-88.

Here, in contrast, the undisputed record discloses that McGarvey and Jenkins threatened to do substantially more than merely question defendant's wife. McGarvey made it clear that his investigation would have real and harmful consequences for her, including costing her valuable employment and subjecting her to trial for abusing her child. Jenkins intimated that she would aggravate those consequences by taking defendant's child away from his wife—and from him—and placing the child with strangers. And, as noted, under ORS 136.425(1), the question is whether any fear produced by those threats induced defendant's statements, not whether those threats were true or false. *See Belle*, 281 Or App at 231 ("It does not matter whether the person making the threat actually has the ability or authority to carry it out, as long as the defendant reasonably perceives the threat to be real."). Thus, contrary to the state's contention, *Bates* does not affect our consideration of McGarvey's and Jenkins's statements about defendant's family.

And, as the state candidly recognizes, those statements were of a sort likely to exert psychological pressure on defendant. But, as noted, the state contends that any such pressure did not rise to the level of inducement such that defendant's resulting statements must be excluded under ORS 136.425(1).

Ultimately, however, it is unnecessary for us to decide whether, standing alone, the statements regarding defendant's family were sufficient to induce his admissions to shaking his child. In evaluating whether defendant's statements were voluntary, we do not consider any factor in isolation—we consider the totality of the circumstances. Here, those circumstances include not only the threats regarding defendant's family, but also McGarvey's implicit promise of leniency if defendant admitted responsibility and, as a result, alleviated those threats. *See id.* at 213 (either the receipt of a benefit or the avoidance of a detriment may render an admission involuntary under ORS 136.425(1)).

In light of those circumstances—and in the absence of any countervailing circumstances identified by the state or apparent from the record—we conclude that defendant's statements were not voluntary. That is, by implicitly promising defendant leniency, while simultaneously exploiting his vulnerabilities as a husband and a father, McGarvey and Jenkins critically impaired defendant's capacity for self determination, such that his admissions cannot be considered "the product of an essentially free, unconstrained, and informed choice," *Ruiz-Piza*, 262 Or App at 573 (internal quotation marks omitted). Accordingly, the trial court erred in denying defendant's motion to suppress those statements.

To summarize, we conclude that the admissions defendant made at the Sutherlin Police Department were induced by promises and threats and that the trial court, therefore, erred in admitting them over defendant's ORS 136.425(1) objection. In light of that conclusion, it is unnecessary to decide whether the trial court plainly erred in failing to instruct the jury of its duty to determine whether those statements were voluntary before considering them as evidence of defendant's guilt.

Convictions on Counts 2, 3, and 4 reversed and remanded; otherwise affirmed.