Argued and submitted January 30; affirmed December 18, 2019; petition for review denied May 21, 2020 (366 Or 493)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# JUAN JOSE CHAVEZ-MEZA,
*Defendant-Appellant.*

## Washington County Circuit Court
C153062CR; A164080

### 456 P3d 322

Defendant appeals from a judgment of conviction for rape in the second degree, sexual abuse in the first degree, and sodomy in the second degree. Defendant assigns error to the trial court's denial of his motion to suppress statements that defendant made to police, contending that the statements were not made voluntarily. Defendant argues that statements that police made to defendant during an interrogation amounted to promises of leniency. The state argues that the detectives' statements were not promises of leniency and that defendant's statements were made voluntarily. *Held*: In light of the totality of circumstances of the interrogation, the state met its burden to demonstrate that defendant's statements to the police were made voluntarily and that his will was not overborne. The trial court did not err in denying defendant's motion to suppress.

Affirmed.

Oscar Garcia, Judge.

Meredith Allen, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

SHORR, J.

Affirmed.

**SHORR, J.**

Defendant appeals from a judgment of conviction for one count of second-degree rape, one count of first-degree sexual abuse, and one count of second-degree sodomy. Defendant raises four assignments of error. We write only to address defendant's second assignment of error, that the trial court erred in denying his motion to suppress statements that defendant had made to the police.[1] We conclude that the state met its burden to demonstrate that defendant's statements to the police were made voluntarily, and we therefore affirm the trial court's denial of defendant's motion to suppress.

When we review a trial court's denial of a motion to suppress in this circumstance,

> "we accept the court's findings of fact if there is any evidence to support them. If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, *e.g.*, voluntariness or lack thereof, made by the trial court. Whether the facts found by the trial court are sufficient to sustain the trial court's ultimate conclusion regarding voluntariness is a question of law that we review for legal error."

*State v. Ruiz-Piza*, 262 Or App 563, 564, 325 P3d 802 (2014) (citations, internal quotation marks, and ellipses omitted). We state the facts in a manner consistent with that standard.

The 12-year-old victim in this case, A, disclosed to a representative of a child abuse assessment center that she had been raped. A told investigators that a "Hispanic guy" raped her in the back of his car, a black Mitsubishi, at a park in Hillsboro. Later, A told investigators that she had connected with the man on Livelinks, a telephone dating service. A gave the man's phone number to Detective Townsend of the Hillsboro Police Department, who discovered that that

---

[1] Defendant also assigns error to the trial court's denial of defendant's motion *in limine* to exclude certain identification evidence and, in a supplemental brief, to the court's imposition of restitution following the parties' stipulated sentencing agreement. We reject those assignments of error without further discussion.

phone number was registered to defendant. A's phone records showed approximately 170 contacts with that phone number. A also identified defendant in a photographic laydown. When A saw defendant's photo, she said, "That's him. That's the guy," and that she was "a hundred percent positive."

After A's identification, Townsend contacted defendant and asked him to meet for an interview. Defendant agreed. Defendant arrived "on his own volition" at the Hillsboro Police Department and met with Townsend and another detective, Hahn. At the beginning of the interview, Townsend told defendant that he was "not going to jail, you're not under arrest, you're free to leave here at any point." Townsend advised defendant of his *Miranda* rights and then began asking defendant questions about his home life and his and his family's phone and internet habits. Defendant provided information about his wife and children, their phone numbers, their internet habits, and other general background information, such as how long he and his wife had been married and what she did for a living. Townsend and Hahn also inquired about defendant's vehicles and his familiarity with Livelinks.

Townsend showed defendant A's photograph and told him that A had identified him in a photographic lineup as the man who had sexually assaulted her. Defendant said that he did not recognize A, and he denied having sex with her. Townsend asked defendant if he would take a polygraph test and provide a DNA sample. Defendant agreed, and said he was "pretty sure" he would pass. Then the following colloquy ensued between Townsend and defendant:

"DET. TOWNSEND:  So—so what I'm looking for is some honesty about what happened.

"[DEFENDANT]:  Yeah.

"DET. TOWNSEND:  —what happened. *And if you just made a mistake, it's not like I'm going to call your wife and ruin your life, okay?*

"[DEFENDANT]:  No, no, no.

"DET. TOWNSEND:  I just want to know what happened and I want to have some honesty that we can pass along to the court instead of all denials.

"[DEFENDANT]:   Yeah.

"DET. TOWNSEND:   You know?

"DET. TOWNSEND:   And if it happened, it happened, it was a mistake, we'll move on.

"*****

"DET. TOWNSEND:   But what I'm saying is *for the outcome of this case, for the district attorney or the judge or whoever that's going to be reviewing this case,* they have the one side of this story that the victim provided, right?

"[DEFENDANT]:   Mm-hm.

"DET. TOWNSEND:   Which is very clear and accurate. And then we have your side of the story that you're giving, which is all denial about what happened. And so I'm just saying, *it would be better for you to tell us what really happened so we can—we can consider both sides of the story.* And right now I only have one side of the story. You know?

"[DEFENDANT]:   About what really happened about what?

"DET. TOWNSEND:   With this gal, because I know that you met up with her and something happened. If what she's saying actually didn't happen, then you need to tell me that. Just say, 'I met with her and nothing happened,' or something. But by you saying you don't know her, you've never seen her, met her, anything, I don't—I don't believe that.

"[DEFENDANT]:   Like I already told you, I mean, I'm telling you the truth."

(Emphases added.)

Hahn then began to interrogate defendant about why he expressed doubt about passing a polygraph test. Defendant explained that sometimes his English was not "a hundred percent."

"DET. HAHN:   But that doesn't have anything to do with a lie detector test, right? That's not what she's asking you. This is about your confidence in whether or not you would pass it. And you—your answer was that you're not confident you're going to pass it. Which is why—why Detective Townsend is telling you that you need to be

honest, because it's very apparent that something happened and you're just not coming clean about it. And again, I think that now is probably the best time for you to just say like, 'This is what happened.' I mean, she already told you you're going to walk out of here today.

"[DEFENDANT]:   Yeah, but I mean—

"DET. HAHN:   And it doesn't matter—

"[DEFENDANT]:   Okay.

"DET. HAHN:   —that you have a daughter who is thirteen, fourteen years old. Sometimes people have urges that they can't control. And even if they have a wife and kids, like, they can't control it and they go beyond that.

"[DEFENDANT]:   No. That's not okay. And I'm being honest to you guys. I mean—

"DET. TOWNSEND:   And like she's saying, this is the time for you to tell us what happened. And, you know, this gal is saying, [defendant], that you raped her. Okay? *If you didn't rape her and it was just you guys made out or there was just a little bit of this and a little bit of that and not the full thing that she's saying, we need to know that information because it does make a difference.*

"[DEFENDANT]:   Yeah.

"DET. TOWNSEND:   Okay? And so that's why this— this is the time, you know, because you're not going to jail. You came here yourself to tell us.

"[DEFENDANT]:   Yeah.

"DET. HAHN:   To meet with us today. And so that's— we gave you this opportunity to talk about what really, really happened.

"DET. TOWNSEND:   And this girl, she's not just going to randomly pick some dude and magically know, 'I should tell them this phone number and I should tell them this description of the car and I should tell them this description of the person and, gee, I sure hope that all the stars align and everything is exactly right,' because it just doesn't work that way.

"I mean, she's given enough detail to—that it all goes together. So she is describing exactly your car, she is describing exactly your phone number, she is describing

exactly you and she picked you out of a lineup. And there's no way—

"* * * * *

"—that she's just randomly doing that and guessing correctly on all that information.

"Which, again, tells us, we're trained investigators, that something happened. That you met up with her and maybe, like Detective Townsend said, maybe you didn't rape her, but there was some contact. I—the evidence is very—

"[DEFENDANT]: No.

"DET. TOWNSEND: —obvious, there was some contact between the two of you. *And it will look better for you in the future if you are honest about that contact now than if you don't come clean about it now.*

"* * * * *

"DET. HAHN: And it's probably really hard for you to talk about. We totally get that. But you—it will be better for you to get it off your chest and just let it out. It appears to me that you're struggling. I can see it in your face that this is hard for you.

"[DEFENDANT]: You know, if somebody told you the same thing to you, something you didn't do, do you feel comfortable?

"* * * * *

"DET. HAHN: [This is a] solid case and there's no doubt in my mind that this is going to be prosecuted.

"[DEFENDANT]: Mm-hm?

"DET. TOWNSEND: We have many cases like this where we have very little evidence. It's kind of like a 'he said/she said' kind of thing. We have a ton of evidence in this case. And so that's why, you know, I'm repeating myself, but that's why we—we like people to tell us their version of the story so we can forward that on. *And—but the court doesn't like to see denials when the evidence is so clear cut.*

"* * * * *

"DET. TOWNSEND: The problem * * * is you are continuing to deny and we have the evidence that shows that

you had contact with her. So it's better for you just to tell us, 'This is what happened.' Like, we can deal with mistakes. People make mistakes all the time, and you still live your life. It's just like you said, you got a DUI and you did exactly what they asked of you, and look, you're running a business, you are successful.

"[DEFENDANT]:    Mm-hm.

"DET. TOWNSEND:    This doesn't have to mean that everything is done and over with, but you have to be responsible, like the person that you clearly are, you're a responsible person and you need to take responsibility for this. Because you connected with her. I mean, there's no doubt you connected with her. So it would just be a really good idea for you to just tell us, 'This is how we met and how we talked and this is what happened,' and get it out.

"* * * * *

"[DEFENDANT]:    * * * I don't know what you want me to tell you.

"DET. TOWNSEND:    Well, we just want the truth. That's all. We want—we want the version of what really happened, and right now, in our minds, the only version we have is what she said. And so usually we have one story and then we have another one and the truth is kind of somewhere in the middle there. And when we don't have two stories, we don't—we can only believe the one that we have.

"So, you know, like we've already said a thousand times, you know, what can you tell us, if something didn't—not as serious happened as what she's saying, this is the only time we're going to find that out, you know, because what she's alleging is very serious. *You know, it's a Measure 11 crime.*

"[DEFENDANT]:    Yeah.

"DET. TOWNSEND:    Yeah, and she's twelve.

"[DEFENDANT]:    I know.

"DET. TOWNSEND:    Right? So if she's—if rape—

"* * * * *

"DET. TOWNSEND:    *If rape didn't occur and it was something a lot less than that, we're never going to know*

*that and never going to be able to consider that unless we talk about it right here, right now."*

(Emphases added.)

Soon after that line of questioning, the detectives left the room to "talk about scheduling" a polygraph exam. Townsend returned and explained that the polygrapher was unavailable. The interrogation resumed. Townsend told defendant that neither she nor Hahn believed defendant's denials. Townsend asked if A "agree[d] to have sex" with defendant and suggested that he did not "really rape her." Townsend said, "I can't see you as being the kind of guy that would hold her down and rape her."

Similarly, Hahn told defendant, "You're not a violent guy," and, "[y]ou don't want to go to jail—for a really long time." Hahn also said, "This is a consensual thing," and then added, "If this was a consensual thing, that's—that's a completely different story, okay?" Hahn asked, "Did she tell you that she was eighteen? Did she say, 'Hey, I'm eighteen,' and—I mean, if you were, *if you believed that she wasn't twelve, that's important for us to know.* That's really important." (Emphasis added.)

Defendant then admitted that he had met A at a party, that he gave her his phone number, and that they talked on the phone after the party; however, defendant continued to deny that he had sex with A. Townsend and defendant exchanged the following:

"DETECTIVE TOWNSEND:  Okay, so we're making progress.

"[DEFENDANT]:  Okay.

"DETECTIVE TOWNSEND:  Right? Because at the beginning you said, 'I don't know that girl and I don't have anything to do with her and we don't know each other and I don't know how,' right? So you were lying in the beginning, right? And we're getting a little bit closer to the truth.

"* * * * *

"Right? But we're not quite there yet, because at some point in time, the two of you met up and you had sex.

"[DEFENDANT]:   No.

"DETECTIVE TOWNSEND:   *And I believe that it was probably consensual, she wanted to have sex with you and you wanted to have sex with her, and you were still of the belief that she was older than eighteen.*

"[DEFENDANT]:   She—she looked like it.

"DETECTIVE TOWNSEND:   There you go. But you have to be honest about what happened. So how—did this party really happen?

"[DEFENDANT]:   Yeah.

"DETECTIVE TOWNSEND:   So did you meet up with her after the fact, and that's when you guys had sex? Was it after the party or was it at the party?

"[DEFENDANT]:   No, no.

"DETECTIVE TOWNSEND:   It was after? After the party?

"[DEFENDANT]:   (No verbal response.)

"DETECTIVE TOWNSEND:   Okay. So tell us about how—she called you. And what did she say? Like, 'Hey let's hook up?' Like, how did that go?

"* * * * *

"[DEFENDANT]:   (No verbal response.)

"DETECTIVE TOWNSEND:   Okay."

(Emphasis added.)

The interview continued for a while, and defendant started to admit some further contact with A by phone and discussed a missed meeting at a local shopping mall. Following further questions, defendant stated that he had met with A at a local park and A had initiated kissing, but defendant denied further sexual contact. After further questioning, defendant admitted to taking A to a hotel approximately a week after the meeting in the park. Defendant at first consistently denied having sexual intercourse with A but admitted to kissing A and receiving oral sex from her in the hotel room.

Defendant also initially stated that he was too scared to engage in sexual intercourse with A, but later admitted to the following:

"[DEFENDANT]:   I got scared.

"DETECTIVE TOWNSEND:   So—

"[DEFENDANT]:   I got scared, I got scared because, you know, I don't—I haven't been with somebody else since my wife.

"DETECTIVE TOWNSEND:   Right.

"[DEFENDANT]:   In sixteen years and I'm like, see, I feel weird.

"DETECTIVE TOWNSEND:   Yeah.

"[DEFENDANT]:   I feel totally weird. I'm like don't.

"DETECTIVE TOWNSEND:   Right.

"[DEFENDANT]:   And then I start.

"DETECTIVE TOWNSEND:   Yeah.

"[DEFENDANT]:   I started it.

"DETECTIVE TOWNSEND:   So did you actually put your penis inside of her for a couple seconds and then be like, 'Okay, this is—

"[DEFENDANT]:   No.

"DETECTIVE TOWNSEND:   '—done'?

"[DEFENDANT]:   No, not even. I was like—

"DETECTIVE TOWNSEND:   Was it a shorter time than that?

"[DEFENDANT]:   I wanted to, I was about to.

"DETECTIVE TOWNSEND:   Well.

"[DEFENDANT]:   A little bit in.

"DETECTIVE TOWNSEND:   Sounds like you probably did for a second and then you were done.

"[DEFENDANT]:   I got scared.

"DETECTIVE HAHN:   No, he just said he put a little bit of it in.

"[DEFENDANT]:   A little bit in.

"DETECTIVE TOWNSEND:   Yeah, a little bit in and then—

"[DEFENDANT]:   I got scared."

        The interview continued, and defendant admitted some further details about his sexual conduct with A but vigorously disputed some other details about his method of communicating with A. After next stating that he "almost" penetrated A with his penis, the interview continued with the following discussion:

"[DEFENDANT]:   Because at first I didn't even know her and she told me like stop, (indiscernible) my reasons, whatever, to tell her about my life, so I don't feel that (indiscernible), so, but that's what happened.

"DETECTIVE TOWNSEND:   Okay.

"[DEFENDANT]:   I'm telling you the truth. And, actually I feel more comfortable now because I'm telling you.

"DETECTIVE TOWNSEND:   I told you you'd feel better. I told you you'd feel better. Everyone does. I'm not kidding you. I wouldn't joke about something like that. Everyone feels better because they get it off their chest.

"[DEFENDANT]:   Yeah, I mean, I feel, you know, at first I was like nervous and everything.

"DETECTIVE TOWNSEND:   Yeah.

"[DEFENDANT]:   But now I feel really different because I'm telling you the truth. I mean, it is the truth. You know, and she can say whatever she wants that happened, and I told you exactly what—what happened. I made out with her, I never came here to Hillsboro. She's the one who was going over there everything and everything, so.

"DETECTIVE HAHN:   I don't have anything else.

"DETECTIVE TOWNSEND:   No, I don't think so.

"[DEFENDANT]:   You don't have any more questions? I mean, I'm going to—

"DETECTIVE TOWNSEND:   Yeah. I don't have any more questions (indiscernible).

"[DEFENDANT]:   Whatever—

"DETECTIVE TOWNSEND:  I—I may later on, I don't—

"[DEFENDANT]:   Whatever you want—

"DETECTIVE TOWNSEND:   —(indiscernible).

"[DEFENDANT]:   Yeah, whatever you want to ask me—

"DETECTIVE TOWNSEND:   Okay.

"[DEFENDANT]:   —or if you want me to come and talk about it. I mean—

"DETECTIVE TOWNSEND:   Sure.

"[DEFENDANT]:   —I'm—I'm—

"DETECTIVE TOWNSEND:   Appreciate that.

"[DEFENDANT]:   (indiscernible) and I feel more comfortable. Actually, I feel better. I mean, I don't feel in my chest like pushing me or whatever.

"DETECTIVE TOWNSEND:   Yeah.

"[DEFENDANT]:  I don't feel nervous no more because—

"DETECTIVE TOWNSEND:   Right.

"[DEFENDANT]:   —it is what it is. I mean—

"DETECTIVE TOWNSEND:   Yeah.

"[DEFENDANT]:   —it's the truth.

"DETECTIVE TOWNSEND:   Right.

"[DEFENDANT]:   But, I mean, I made a mistake, like I told you.

"DETECTIVE TOWNSEND:   Yeah.

"[DEFENDANT]:   After I see the picture, I feel bad now."

Defendant finally discussed how A appeared older when he met her in person than how she appeared in the photograph that the detectives showed him. He recounted how A appeared 19 years old in person. Defendant then received a call, and Townsend stated, "We'll walk you out.

We're done actually. We won't hold you up anymore from work."

Defendant was later arrested and charged with second-degree rape, first-degree sexual abuse, and second-degree sodomy. Defendant waived his right to a jury, and the case was tried before the court. Defendant moved pretrial to exclude his statements to detectives during the interrogation contending, among other things, that his statements were not voluntary. Defendant argued that his confession was made "under duress," because "[a] reasonable person [in defendant's position] would believe that the detectives were suggesting facts that they want to hear from him and that if he gave them those facts then his case would be handled in a lenient manner like the prostitution and the DUI of a decade ago." The state responded that defendant had not been induced by threat or promise, and that the fact that defendant had continued to deny having any sexual contact with A during the challenged portion of the interrogation demonstrated that his will was not overborne.

The trial court concluded that defendant's will was not overborne. The court considered that defendant

> "appeared voluntarily when he was being interviewed in this room. He was informed. He was given his *Miranda* rights. No question he was free to leave at any time. In the video, it shows the door is right next to him; it's not blocked."

The court further found that there had been no "threats, coercion, or promises of leniency" by the detectives, and that the "language that was used by * * * both the detectives in this case" did not rise "to that level that would require suppression." Accordingly, the court denied defendant's motion. The trial proceeded, and defendant was convicted on all three counts.

Defendant now assigns error to the trial court's denial of his motion to suppress. Defendant argues that Townsend made an express promise of leniency that, if defendant "just made a mistake, it's not like I'm going to call your wife and ruin your life." Defendant also argues that both detectives impliedly promised him leniency when they offered him less serious alternatives by implying that,

if he confessed to having consensual sex with A or admitted that he thought she was older, it would be a less serious crime. The state responds that defendant's confession was voluntary because detectives made no promise of leniency and their minimization of his conduct did not amount to improper coercion.

Defendant's arguments arise under ORS 136.425 and Article I, section 12, of the Oregon Constitution.[2] Both the statute and Article I, section 12, "embody the common-law rule that confessions made by a defendant in custody that were 'induced by the influence of hope or fear, applied by a public officer having the prisoner in his charge,' are inadmissible against the defendant." *State v. Jackson*, 364 Or 1, 21, 430 P3d 1067 (2018) (quoting *State v. Powell*, 352 Or 210, 218, 282 P3d 845 (2012) (additional internal quotation marks and citation omitted)). It is well established that confessions are presumed to be involuntary. *Id.* (citing *Powell*, 352 Or at 225-26; *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991)). The burden is on the state to "overcome that presumption by offering evidence affirmatively establishing that the confession was voluntary." *Id.*; *see also State v. Vasquez-Santiago*, 301 Or App 90, 106 n 4, 456 P3d 270 (2019) ("[I]t is not defendant's burden to prove the confession was caused by an unlawful police inducement. Rather, the confession is presumed involuntary. It is the state's burden to prove the confession was *not* the product of an unlawful inducement." (Emphasis in original; internal quotation marks omitted.)). The reason for this presumption is to ensure that confessions are reliable.

Confessions are involuntary, and thus unreliable, when they are "rendered under circumstances in which the confessor perceives that he or she may receive some benefit or avoid some detriment by confessing, regardless of the truth or falsity of the confession." *Jackson*, 364 Or at 23. In

---

[2] The state contends that defendant's argument under the Oregon Constitution is unpreserved because he did not raise it as a basis for his argument before the trial court. The state, however, maintains that its argument regarding preservation is of "little practical import" to the extent that the statutory and constitutional analyses are identical "in all respects that bear on this case." *See Ruiz-Piza*, 262 Or App at 572-73 (applying same standard under statutory and constitutional analysis); *State v. Jackson*, 364 Or 1, 21, 430 P3d 1067 (2018) ("[B]oth the statute and Article I, section 12, embody the common-law rule.").

*Jackson*, the Supreme Court provided a "useful approach" for determining the voluntariness of a defendant's confession. *Vasquez-Santiago*, 301 Or App at 107. The court noted that it is "helpful to begin with the issue of whether the officers who interrogated defendant induced him to make admissions by the influence of hope or fear." *Jackson*, 364 Or at 22. The ultimate question is whether the state has met its burden to show that defendant's confession was a product of defendant's free will. *Id.* at 27-28. "Those issues are interrelated and \*\*\* we must look to the totality of the circumstances in reaching a legal conclusion about the voluntariness of defendant's statements." *Id.* at 22.

Using the approach provided in *Jackson*, we begin with the question of whether the officers who interrogated defendant induced him into confessing by the influence of hope or fear. Defendant argues primarily that (1) detectives impliedly promised him leniency by telling him that things would be "better" with the "district attorney or judge or whoever" if he confessed, (2) detectives expressly promised him leniency by telling defendant that, if he "just made a mistake, it's not like I'm going to call your wife and ruin your life," and (3) detectives impliedly promised defendant leniency by minimizing his alleged crime and advising him that, if the sexual encounter with A was consensual, or if he believed she was 18 years old, it would be a lesser crime.

The state argues that the detectives' statements that defendant objects to could not be construed as a promise of leniency because, even assuming they were promises of leniency, they were not promises of leniency "*in exchange for defendant's confession.*" (Emphasis in original.) The state distinguishes this case from other cases in which the defendants had been offered a *quid pro quo* of leniency in exchange for a confession. *See, e.g.*, *State v. Hogeland*, 285 Or App 108, 117, 395 P3d 960 (2017) (holding that the *quid pro quo* in detectives' statements was clear when detectives told the defendant that he could either admit to the crime and "start the healing process" or continue to deny responsibility and no one would believe him); *State v. Pollard*, 132 Or App 538, 549, 888 P2d 1054, *rev den*, 321 Or 138 (1995) (holding that a "*quid pro quo* was apparent" when detectives told the defendant he could admit what had occurred and

get "help" or his case would be taken "to a grand jury" and it would be "real rough"). The state instead compares this case to others in which detectives' urging to a defendant to confess did not amount to a promise, express or implied, that doing so would result in leniency, because detectives either told or suggested to the defendant that he would be prosecuted, regardless of his confession. *See, e.g.*, *State v. Spieler*, 269 Or App 623, 632, 346 P3d 549 (2015) (concluding that detectives' suggestion that the defendant's actions may have been beyond his control and that he needed help or treatment were not promises of leniency when they suggested that the defendant would be prosecuted); *State v. Bounds*, 71 Or App 744, 748, 694 P2d 566, *rev den*, 299 Or 732 (1985) (concluding that police officer's statement that the courts and district attorney would not "crucify" the defendant was not a promise of immunity when the defendant was told he would be prosecuted).

"A promise of leniency may be express or implied." *Hogeland*, 285 Or App at 114. "The precise form of words in which the inducement is presented is immaterial. It is sufficient if the inducement conveys to a person the idea of temporal benefit or disadvantage, and that the person's confession follows in consequence of the hopes thereby excited." *Id.* at 114-15 (internal quotation marks, brackets, and ellipses omitted). On the other hand, a "mere adjuration" to tell the truth, [or] a mere statement that it would be better to tell the truth" is permissible. *Jackson*, 364 Or at 24. The distinction is "whether the language used in regard to speaking the truth, taken in connection with all the attending circumstances shows the confession was made under the influence of some threat or promise." *Id.*

Applying those standards, we review the detectives' statements that defendant contends were coercive, and we consider them both individually and in light of the totality of the circumstances of the interview. Here, the detectives' statements to defendant at the least suggested that he would be prosecuted, whether or not he confessed. Hahn told defendant explicitly that this was a "solid case and there's no doubt in my mind that this is going to be prosecuted." The detectives also confronted defendant with the evidence, including phone records between defendant and the victim

and a photo identification by the victim. The detectives told defendant that it would be better "for the outcome of this case for the district attorney or the judge or whoever that's going to be reviewing this case" to have both "sides" of the story, making clear to defendant that the detectives believed the case would be prosecuted. Those statements also did not suggest that, if defendant confessed, he might receive immunity or leniency. As in *Bounds* and *Spieler*, the detectives' statements regarding the court and the district attorney did not imply to defendant that he could do anything to avoid being prosecuted. Although the statements imply that it ultimately would be better for defendant to present his side of the matter to refute the victim's account, we do not view the detectives' statements as an implied promise of immunity or leniency from the district attorney or court.

Similarly, the detectives' minimization of defendant's suspected conduct did not suggest to defendant that he could avoid prosecution. Defendant takes issue with the detectives' suggestions that, if he believed A was older than 18, or if their sexual contact was consensual, that it would not be a "Measure 11 crime." First, we do not entirely agree with defendant's characterization. The detectives stated that what the victim had alleged is "very serious" and qualifies as "a Measure 11 crime," which is entirely accurate. The detectives then proceeded with three possible scenarios that suggested to defendant that he might be facing less serious consequences depending on the facts: (1) that if it was not "rape," the crime would be less serious, (2) that if it was not forcible rape, it would be less serious, and (3) if defendant believed that A was not 12 and was 18, it would be less serious.

The first two of those statements are either accurate or may be accurate depending on the underlying facts ultimately shared by defendant, but the third statement could not be accurate. As to the first statement, it is accurate that rape is treated as a more serious and severely punished crime than other sexual abuse crimes. *Compare* ORS 163.375 (rape in the first degree) *with* ORS 163.427 (sexual abuse in the first degree). *See also* ORS 137.700 (setting mandatory sentences for first-degree rape and first-degree sexual abuse at 100 and 75 months, respectively).

As to the detective's second statement, it was accurate to the extent that a rape that is done by "forcible compulsion" is first-degree rape punishable by 100 months in prison. ORS 163.375(1)(a) (defining rape in the first degree); ORS 137.700(2)(a)(K) (setting 100-month mandatory sentence for first-degree rape). By contrast, sexual intercourse with a victim younger than 14 (but at least 12) is second-degree rape without regard to the use of force and is punishable by 75 months' incarceration. ORS 163.365(1) (defining rape in the second degree); ORS 137.700(2)(a)(L) (setting forth mandatory sentence for second-degree rape).

The detective's third statement, however, could not be accurate and was deceptive. Because the victim was 12 years old, it would not have been a defense to rape, sodomy, or sexual abuse if defendant had believed that she was 18. *See* ORS 163.325(1) (stating that, in any prosecution for certain sexual offenses, including rape, sodomy, and sexual abuse, ignorance or reasonable mistake as to the child's age is not a defense if the child is under the age of 16). To the extent that the detectives suggested otherwise, their statements were deceptive. Generally, "police deception weighs against a finding of voluntariness." *State v. Cochran*, 72 Or App 499, 512, 696 P2d 1114 (1985). *But see State v. Davis*, 350 Or 440, 452-53, 256 P3d 1075 (2011) (explaining that, at common law, police deception did not automatically render a confession involuntary). We address at the end of our analysis whether that deception amounted to an inducement by hope or fear that was sufficient to overcome defendant's will and render his statements involuntary.

Before doing so, we turn to defendant's final argument that his confession was induced by deception. Defendant argues that the detectives' statement that they would not call his wife was an express promise of leniency that exploited his vulnerability as a husband. We disagree. "The hope of avoiding prosecution is not *** the only inducement that may render a confession involuntary." *Jackson*, 364 Or at 23. We have previously observed that appeals to parental and family responsibilities can be particularly coercive. *See, e.g.*, *Vasquez-Santiago*, 301 Or App at 118 (holding that a defendant's confession was involuntary when the defendant "believed that his infant was separated from the child's

nursing mother and being detained by police, was repeatedly told that his family was suffering, and was told that his confession to murder was the key to securing the family members' release and ending that suffering"); *Hogeland*, 285 Or App at 121 (holding that a detective's statement to the defendant that, unless he confessed, she would take the child away from him and his wife and place the child in stranger foster care "simultaneously exploit[ed] his vulnerabilities as a husband and father [and] critically impaired defendant's capacity for self determination"); *Ruiz-Piza*, 262 Or App at 574-75 (holding that detectives' suggestion that, unless the defendant confessed to shaking his child, her medical care would suffer, rendered the defendant's confession involuntary).

The detectives' statement regarding defendant's wife here was significantly different from the statements in *Ruiz-Piza*, *Hogeland*, and *Vasquez-Santiago*. Here, detectives neither suggested nor implied that, if defendant did *not* confess, they would call his wife. Rather, the statement that, if he made a mistake, it was "not like" they would call his wife and ruin his life was an assurance that, whether defendant confessed or not, the detectives would not call defendant's wife. To be sure, the statement was a promise, but it was not accompanied by an implied condition that, in order for detectives *not* to call defendant's wife, he would need to confess.

We next address an additional part of the inquiry articulated in *Jackson*: whether, when considering the totality of the circumstances of the interrogation, the defendant's confession was voluntary. Defendant has identified one statement during the interview that was misleading as to a legal defense that defendant did not, in fact, have (*i.e.*, the implication that if defendant believed the victim was older than 18, the crime would be less severe). Despite the deceptive nature of that statement, we conclude that the state met its burden to show that defendant's statements were voluntary in light of the totality of the circumstances. As the trial court noted, defendant was not in custody at any time during the interview. He appeared voluntarily at an interview with two detectives and sat in the room next to the door. Defendant was told he was free to leave at the outset of

the interview, and he was informed that he would be permitted to leave at the conclusion of the interview. The detectives also informed defendant of his *Miranda* rights at the beginning of the interview. The interview lasted approximately two hours. Defendant's answers do not show that he misunderstood the detectives' questions or appeared to be under particular duress. Finally, defendant ultimately made his most damaging admissions during periods of the interview that were largely in response to fact-based questions about what had occurred during the times he met with the victim. After those admissions, defendant expressed great relief that "I'm telling you the truth. And actually, I feel more comfortable now because I'm telling you." He explained that he no longer felt his chest "pushing me." Defendant stated that he was initially nervous in talking with the police, but "now I feel really different because I'm telling you the truth. I mean, it is the truth. You know, and she can say whatever she wants that happened, and I told you exactly what—what happened."

Defendant's confessions were not made in response to deceptive police statements or as part of any implicit or explicit exchange for leniency. Rather, defendant appeared to be relieved that he had unburdened himself by sharing his side of the events. We affirm the trial court's conclusion that the state met its burden to show that, under the totality of the circumstances, defendant's statements were voluntary and not a product of police coercion.

For the reasons stated above, we conclude that, in light of the totality of the circumstances of the interrogation, the state met its burden in the trial court to show that defendant's statements to detectives were made voluntarily, and his will was not overborne. *Jackson*, 364 Or at 27-28. Accordingly, we affirm the trial court's denial of defendant's motion to suppress.

Affirmed.